STATE of Wisconsin, Plaintiff-Respondent-Petitioner,

v.

Dean JOHNSTON, Defendant-Appellant-Cross Petitioner.

Supreme Court

*No. 92–1857–CR. Oral argument April 27, 1994.—Decided June 17, 1994.*

(Also reported in 518 N.W.2d 759.)

795

For the defendant-appellant-cross-petitioner there were briefs and oral argument by *Keith A. Findley,* assistant state public defender.

For the plaintiff-respondent-petitioner the cause was argued by *Stephen W. Kleinmaier,* assistant attorney general, with whom on the briefs was *James E. Doyle,* attorney general.

DAY, J. This is a review of a published decision of the court of appeals, *State v. Johnston,* 178 Wis. 2d 20, 503 N.W.2d 346 (Ct. App. 1993), reversing a judgment and order of the circuit court for Winnebago county, Honorable Robert A. Haase, Judge. The defendant, Dean Johnston (Mr. Johnston), was convicted on one count of selling alcoholic beverages to underage persons in violation of sec. 125.04(1), Stats.,[1] and one

---

[1] **125.04 General licensing requirements. (1)** LICENSE OR PERMIT; WHEN REQUIRED. No person may sell, manufacture, rectify, brew or engage in any other activity for which this chapter provides a license, permit, or other type of authorization without holding the appropriate license, permit or authorization issued under this chapter.

count of evading the law by giving away fermented malt beverages (beer) contrary to sec. 125.315(1), Stats.,[2] both misdemeanors. Mr. Johnston was also found guilty of a civil forfeiture violation for selling fermented malt beverages without a license, contrary to sec. 125.07(1), Stats.[3] The court of appeals reversed the circuit court because it concluded that the evidence used was seized during an invalid warrantless search. We reverse the court of appeals decision and reinstate the judgment of the circuit court.

On the evening of April 3, 1991, Oshkosh police raided the home of the defendant, Mr. Johnston, arresting him and others at a beer drinking party involving mostly college students. The police first gained entrance to Mr. Johnston's residence through undercover agents (and one civilian agent) posing as party-goers. Unaware that they were police officers, Mr. Johnston invited the undercover officers and the civilian agent to attend the party.

Once inside the home, the undercover officers observed a beer drinking party in progress. They observed between fifteen to twenty persons present, increasing to forty to fifty persons, milling around and drinking what the officers identified as beer. At least

[2] 125.315 **Evading provisions of law by giving away fermented malt beverages.** (1) No person may give away any fermented malt beverages or use any other means to evade any law of this state relating to the sale of fermented malt beverages.

[3] 125.07 **Underage and intoxicated persons; presence on licensed premises; possession; penalties.** (1) ALCOHOL BEVERAGES; RESTRICTIONS RELATING TO UNDERAGE PERSONS. (a) *Restrictions.* 1. No person may procure for, sell, dispense or give away any alcohol beverages to any underage person not accompanied by his or her parent, guardian or spouse who has attained the legal drinking age.

one of the underage drinkers present appeared to the officers to be intoxicated.

The officers were directed to Mr. Johnston who was standing behind a bar in the basement. Mr. Johnston demanded payment of three dollars from each of the officers and the civilian agent. Mr. Johnston quipped to two of the officers that the money was not for the beer, but was "for the music," and told the third officer that the money was "for the cup." The civilian agent was not told what the money was for, but understood it was for the beer. After payment was made (in marked bills), the undercover officers, including one officer under the legal drinking age, were given plastic beer cups and told that the beer was in the corner and that they should help themselves. The officers sampled the fermented malt beverage, which they identified as beer.

The officers concluded from these observations that they had established probable cause that Mr. Johnston was involved in the illegal sale and distribution of alcohol, and that the alcohol was being sold or given to underage college students who were consuming the beer on the premises.

According to the prearranged plan, the undercover officers were to remain at the party inside the house for fifteen minutes if they found probable cause that crimes were being committed. Having found probable cause, the officers remained. The uniformed officers outside the house were alerted by this signal that they should come in and assist the undercover officers by making the actual arrests. Shortly thereafter, the uniformed officers entered the house through the open back door, the entrance used by the party-goers, and proceeded to the basement where the party was taking place. The uniformed officers then checked the identifi-

cation of all present, made the necessary arrests, and seized various items as evidence, including two half-barrels of beer, a beer tap, plastic beer cups, three beer signs, and the marked money which had been paid to Mr. Johnston. The undercover officers and the civilian agent continued to conceal their true identities and were handled by the uniformed officers as if they were ordinary party-goers.

Mr. Johnston was found guilty by a jury on one count of selling alcoholic beverages to underage persons in violation of sec. 125.04(1), Stats., and one count of evading the law by giving away fermented malt beverages contrary to sec. 125.315(1), Stats., both misdemeanors. Mr. Johnston was also found guilty of a civil forfeiture violation for selling malt beverages without a license, contrary to sec. 125.07(1), Stats.

Mr. Johnston raises several issues on appeal. He claims that: (1) the warrantless search and seizure of evidence by the uniformed officers violated his Fourth Amendment right to privacy; (2) the evidence cannot support his conviction on both criminal misdemeanor counts; (3) the state improperly included the civil forfeiture claim in the criminal complaint; and, (4) the trial court erred in denying his motion for sentence modification, which was based upon his change in behavior after sentencing.

The court of appeals reversed the circuit court on the first issue, because it concluded that the warrantless search and seizure were invalid, and remanded to the circuit court. The court of appeals also considered the second and third claims, because they were likely to be contested on remand, and decided adversely to Mr. Johnston's position. The issue of Mr. Johnston's motion for sentence modification was not addressed.

We conclude that the search, seizure and arrest were valid, and therefore reverse the decision of the court of appeals. As to the second and third issues raised by Mr. Johnston, we conclude that they, too, must be decided adversely to Mr. Johnston. On the fourth issue, we conclude the trial court acted properly in refusing to modify Mr. Johnston's sentence.

The first issue we address is whether the warrantless search in Mr. Johnston's home and the seizure of the evidence found in the home violated Mr. Johnston's Fourth Amendment rights. This issue presents constitutional questions which we review independently of the trial or appellate courts. *See, State v. Murdock,* 155 Wis. 2d 217, 226, 455 N.W.2d 618 (1990).

Warrantless searches are unreasonable *per se* under the Fourth Amendment, subject to a few carefully delineated exceptions. *Katz v. United States,* 389 U.S. 347, 357, 88 S. Ct. 507 (1967); *State v. Boggess,* 115 Wis. 2d 443, 449, 340 N.W.2d 516 (1983). The exceptions are "jealously and carefully drawn," *Jones v. United States,* 357 U.S. 493, 499, 78 S.Ct. 1253 (1958). The burden is on the state to show that the search and seizure in question fall within one of the recognized exceptions to the warrant requirement. *United States v. Jeffers,* 342 U.S. 48, 51, 72 S. Ct. 93 (1951).

One of the primary exceptions to the warrant requirement is consensual searches. *Lewis v. United States,* 385 U.S. 206, 209–210, 87 S. Ct. 424 (1966); *Coolidge v. New Hampshire,* 403 U.S. 443, 455, 91 S. Ct. 2022 (1971); *Schneckloth v. Bustamonte,* 412 U.S. 218, 219, 93 S. Ct. 2041 (1973). It is well established that a government agent may accept an invitation to

enter a private dwelling, in the same manner as a private person, for the very purposes contemplated by the occupant. *Lewis,* 385 U.S. at 210–211. Since it is undisputed that Mr. Johnston invited the undercover officers and the civilian agent into his home to attend the party, the entry of the undercover officers was made with consent and was therefore lawful. *See, Johnston,* 178 Wis. 2d at 29, n.1, 31.

■

It does not matter that the undercover officers obtained the consent through deceit and by concealing their identities. It has long been acknowledged that valid consent for the entry of government agents into a dwelling may be obtained even though accomplished by deceit and concealed identity. *Lewis,* 385 U.S. at 209–210. Following *Lewis,* the Seventh Circuit in *United States v. Scherer,* 673 F.2d 176, 182 (7th Cir. 1982), held that "[a] government agent may obtain an invitation onto property by misrepresenting his identity, and if invited, does not need probable cause nor warrant to enter so long as he does not exceed the scope of his invitation." *See also, United States v. Paul,* 808 F.2d 645, 648 (7th Cir. 1986). This is what we conclude occurred here.[4]

---

[4] Justice Geske writes in her dissent, at 827 that, "[e]ven if Johnston's expectation of privacy 'could be unknowingly waived by the presence of an undercover officer, this cannot realistically be construed as a waiver of expectations of privacy as to 'a class of persons whose very existence is unknown' to [him]." (Citations omitted.)

Justice Geske is correct that waiver requires an intentional relinquishment or abandonment of a known right or privilege. *See, State v. Albright,* 96 Wis. 2d 122, 129–131, 291 N.W.2d 487 (1980). However, this is not a case of waiver, but rather this is a case of consent. The United States Supreme Court has not

Once on the premises as invitees, the undercover officers were free to observe the events at the party. These observations provided the undercover officers with probable cause that crimes were being committed on the premises. Normally, "no amount of probable cause can justify a warrantless search or seizure [or arrest] absent 'exigent circumstances' " or some other exception to the warrant requirement, *Coolidge,* 403 U.S. at 468; *State v. Pires,* 55 Wis. 2d 597, 607–608, 201 N.W.2d 153 (1972). However, as invitees, the undercover officers satisfied the consent exception to the warrant requirement. As in *United States v. Ruiz-Altschiller,* 694 F.2d 1104, 1107 (8th Cir. 1982), "the defendants knowingly and voluntarily invited the undercover law enforcement agents into their residence for the purpose of conducting illegal business. The defendants, by extending such an invitation, voluntarily exposed themselves to a warrantless arrest." *See also, United States v. Collins,* 652 F.2d 735, 739 (8th Cir. 1981), *cert. denied* 455 U.S. 906, 102 S. Ct. 1251; *United States v. Davis,* 646 F.2d 1298, 1301 (8th Cir. 1981), *cert. denied,* 454 U.S. 868, 102 S. Ct. 333 (1981).[5]

required the standard of waiver for valid consent under the Fourth Amendment. In *Lewis,* 385 U.S. at 209–210, the court found valid consent even though the consent was obtained by ruse. Appellate level cases cited by the dissent from Oregon and Washington do not upset that holding.

[5] Mr. Johnston's expectation of privacy, as Justice Geske terms it, dissenting op. at 827 was already lost *as against the State* with the lawful entry of the undercover officers. Once the initial entry was made lawfully by officers of the state, Mr. Johnston could not expect privacy as to what they witnessed. Since the uniformed officers were only providing backup and assistance and did not exceed the scope of the authorization for

Both the events witnessed by the undercover officers and the items which were later seized were within the officers' "plain view" and well within the scope of the consent given to those invited to attend the party. As such, the items were subject to seizure. In *Payton v. New York,* 445 U.S. 573, 587, 100 S. Ct. 1371 (1980), the U.S. Supreme Court stated that "[t]he seizure of property in plain view involves no invasion of privacy and is presumptively reasonable, assuming that there is probable cause to associate the property with criminal activity." Likewise, in *Coolidge,* 403 U.S. at 465, the U.S. Supreme Court noted that, "[i]t is well established that under certain circumstances the police may seize evidence in plain view without a warrant.. . . Where the initial intrusion that brings the police within plain view of such an article is supported, not by a warrant, but by one of the recognized exceptions to the warrant requirement, the seizure is also legitimate. . . . [Similarly] an object that comes into view during a search incident to arrest that is appropriately limited in scope under existing law may be seized without a warrant." Finally, this court has also held, in *Pires,* 55 Wis. 2d at 608, that " '[i]t has long been settled that objects falling in the plain view of an officer who has a right to be in the position to have that view are subject to seizure and may be introduced in evidence.' " Thus, having once found probable cause that crimes were being committed on the premises, the undercover officers were justified in effectuating arrests of those suspected of conducting the criminal activity and in seizing those items or contraband used to commit the crimes.

---

the initial entry, there is no intrusion upon the privacy of Mr. Johnston.

Much of this is conceded by Mr. Johnston. *Johnston,* 178 Wis. 2d at 29, n.1, 31. He concedes that the undercover officers were lawfully on the premises and that the undercover officers had probable cause to make the arrests and to seize those objects which were within their plain view. Mr. Johnston conceded in oral argument before this court that had the *undercover* officers made the arrest and seizure themselves, there would have been no violations of the Fourth Amendment. His only complaint, then, is about the conduct of the *uniformed* officers who gave assistance.

Mr. Johnston complains first that there was no justification for the entry by the uniformed police. Mr. Johnston argues that the entry by the undercover officers and the entry by the uniformed officers were each separate intrusions into the home, and, as such, that each of the entries must be independently justified under an exception to the warrant requirement or be found invalid. Mr. Johnston contends that the two entries were so separated that the exception to the warrant requirement which was applicable to the undercover officers cannot be "transferred" to the uniformed officers.

In the alternative, Mr. Johnston argues that even if the exception allowing the undercover officers' entry and search provided justification for the subsequent entry of the uniformed officers, the uniformed officers exceeded the scope of the exception by expanding the search once inside the house. As this court noted in *Pires,* 55 Wis. 2d at 605, "[a] search, lawful at its inception, may become unlawful by broadening its intensity and scope unless further steps are taken that can independently satisfy constitutional requirements."

The state counters by arguing that the entry by the uniformed officers was justified either under the "exi-

gent circumstances" exception to the warrant requirement or as an extension of the consent given to the undercover officers. The state denies that the uniformed officers exceeded the scope of what was and could have been done by the undercover officers.

The court of appeals rejected the state's arguments and agreed with Mr. Johnston that the uniformed officers had exceeded the scope of the consent obtained by the undercover officers. The court of appeals began its analysis correctly when it observed that "[a] general principle in Wisconsin is that additional officers may enter an individual's home after one officer has been legally admitted provided that they do not expand the scope or intensity of the search." *Johnston,* 178 Wis. 2d at 32 (citing to *Pires,* 55 Wis. 2d at 604–605). *See also, United States v. White,* 660 F.2d 1178, 1183 (7th Cir. 1981); *United States v. Janik,* 723 F.2d 537, 548 (7th Cir. 1983); *United States v. Paul,* 808 F.2d at 648. However, when applying this general principle to the present facts, the court of appeals reversed the circuit court because it concluded that the uniformed police had exceeded the scope and intensity of the search when they checked the identification of each of the party-goers. *Johnston,* 178 Wis. 2d at 32. This, the court of appeals concluded, "expanded the original search beyond what the undercover team had witnessed inadvertently and in plain view." *Id.*

We disagree with this interpretation of the law. We conclude that the entry of the uniformed officers was justified as back-up and assistance. Having determined that the undercover officers were lawfully present, and having determined that the undercover officers could have arrested the suspects and seized the items used in the criminal activity, we conclude that

the uniformed officers entered to perform back-up and assistance and did no more than was allowed to the undercover officers. As the Seventh Circuit concluded in *Paul,* 808 F.2d at 648 "when one invites an undercover agent into his house, the agent can summon other agents to assist in the arrest, and the other agents are not guilty of a violation of the Fourth Amendment." *See also, United States v. Janik,* 723 F.2d 537, 548 (7th Cir. 1983); *United States v. Cerri,* 753 F.2d 61, 63 (7th Cir. 1985); *U.S. v. Diaz,* 814 F.2d 454, 459 (7th Cir. 1987). Thus, in terms of Fourth Amendment protections, the uniformed officers did nothing more than assist the undercover officers who were themselves lawfully on the premises and who were, as conceded by Mr. Johnston, fully within the law to arrest the suspects and seize the incriminating evidence they had discovered.

On the question of whether the assisting officers exceeded the scope of what was permissibly accomplished by the undercover officers, the record is clear, as in *Lewis,* 385 U.S. at 210, that the undercover police did not "see, hear, or take anything that was not contemplated, and in fact intended, by petitioner as a necessary part of his illegal business." The uniformed officers in this case did nothing beyond that already permissibly accomplished by the undercover officers. As this court concluded in an analogous situation in *La Fournier v. State,* 91 Wis. 2d 61, 69, 280 N.W.2d 746 (1979), "[t]hese officers were called as backup; they were completing that which was lawful under the first entry, securing evidence in plain view. They did not expand the scope or nature of the original entry. Their purpose was limited to [securing, *sic*] the evidence . . . found in plain view."

The identification check performed by the uniformed officers was not an act which impermissibly "expanded" an otherwise lawful search. Having established probable cause that criminal activity was taking place, the police were justified in making arrests and in performing an investigatory detention of the remaining party-goers. All that is required for an investigatory detention is a reasonable articulable suspicion of criminal activity. *Terry v. State of Ohio,* 392 U.S. 1, 21–22, 88 S. Ct. 1868 (1968); *See also, Adams v. Williams,* 407 U.S. 143, 145–146, 92 S. Ct. 1921 (1972); *Michigan v. Summers,* 452 U.S. 692, 696–699, 101 S. Ct. 2587 (1981); *Rivera v. U.S.,* 928 F.2d 592, 606 (2d Cir. 1991). The undercover officers here had already established probable cause as to underage drinking and the sale or delivery of alcohol to minors. The record demonstrates that the identification check was performed quickly and orderly with minimal intrusion.

The last issue addressed by the court of appeals in this context was whether the police could or should have obtained a warrant despite the exceptions to the warrant requirement. In dismissing the state's claim that the entry by the uniformed officers was justifiable on the grounds of exigent circumstances, the court of appeals suggested that the police should have obtained a warrant. The court commented that, "[t]he state has not shown that a warrant could not have been procured or that it was even considered." *Johnston,* 178 Wis. 2d at 37. The court of appeals commented that there was no need for the uniformed officers to enter because the officers in the house were not endangered and they gave no indication that "time was of the essence." *Johnston,* 178 Wis. 2d at 37. The court of appeals then went on to suggest how the police should have handled the

crime scene: "Uniformed officers had Johnston's building surrounded and could have stopped those persons leaving the party. Likewise, the police could have prevented the removal of the kegs. The officers knew that Johnston's party had just started so it was not likely that it would end soon." *Id.*

We disagree. A court may consider whether the police should or could have obtained a warrant when assessing whether exigent circumstances existed in a given case. However, the mere possibility that a warrant might have been obtained does not automatically invalidate the police actions. The fact that the police did not obtain a warrant places the burden on the police to show that their actions were justified under one of the exceptions to the warrant requirement. Owing to the consent in this case, and the fact that the scope of that consent was not exceeded, the state has met this burden.

Exigent circumstances are not required for back-up and assistance. The inquiry about exigent circumstances goes only to the initial justification for the warrantless entry. Since the initial entry has been justified under the consent exception to the warrant requirement, exigent circumstances are not required to justify the use of back-up or assistance. The Seventh Circuit faced similar situations in both *Paul,* 808 F.2d at 647, and *Diaz,* 814 F.2d at 458–459. In both cases the court noted that a search warrant should have been obtained by the police, and in both cases the court denied exigent circumstances. However, the court refused to invalidate the searches in those cases

because the searches were justified under the consent exception to the warrant requirement.[6]

Thus, contrary to what might have been implied by the court of appeals, there is no rule that back-up or assistance may be had only when there are exigent circumstances. Time does not need to be "of the essence" and the officers certainly do not need to be in an emergency or in mortal danger before we will allow back-up and assistance.[7] However, we note without holding that there were elements of exigency on these facts. Had the police done as suggested by the court of appeals, *Johnston*, 178 Wis. 2d at 37, and simply surrounded and sealed-off the Johnston house, the party-goers probably would have been alerted to the police presence either when additional party-goers arrived or certainly as any one of the party-goers already present attempted to leave. And, had the police not wished to

---

[6] The state has urged this court to adopt what was referred to as the "consent once removed" doctrine, in *Diaz*, 814 F.2d at 459. We decline to do so. Although we recognize that, on the facts in this particular case, the doctrine of "consent once removed" is very similar in operation to our present analysis, we limit our holding to allowing back-up or assistance once an officer lawfully on the scene has established probable cause for immediate arrest or seizure and requests back-up or assistance. The doctrine of "consent once removed" was first mentioned in *Diaz*. We find the term confusing and unnecessary. As the Seventh Circuit's own cases demonstrate, this terminology or doctrine was not necessary to reach the result in *Paul* or *Janik*, cases analogous to the present case, and we conclude it is not helpful here.

[7] There is no rule that police may not lawfully request backup or assistance unless they "face a perilous situation," as Justice Geske suggested, Dissenting op. at 829 and we will not create such a rule.

alert the party-goers by sealing-off the house, there was a risk that the party would have dispersed while the officers waited. Finally, the primary evidence, being a liquid, was easily disposable, and, judging from Mr. Johnston's attempt to hide the marked bills upon learning of police presence, it was not unreasonable for the police to fear that the evidence was in danger of destruction.[8] Accordingly, under the circumstances of this case, we will not second-guess police tactics so long as the constitutional requirements are met.

Finally, we note that it is irrelevant that the undercover agents did not make their identity known to the party-goers and did not actually assist in the arrests and seizures. Again, the question is whether the assisting officers exceeded the scope of what was permissibly accomplished by the undercover officers. Beyond this, there is no requirement under the Fourth Amendment governing the allocation of tasks in an arrest or seizure. There is no requirement that an arrest or seizure may be made only by the one who actually witnessed the events leading to the establishment of probable cause. Nor is there any rule that the valid consent obtained through concealed identity is

---

[8] The test for exigency to prevent the possible destruction of evidence is an objective one. The question is whether a police officer under the circumstances known to the officer at the time reasonably believes that delay in procuring a warrant would risk destruction of evidence. *State v. Smith,* 131 Wis. 2d 220, 230, 388 N.W.2d 601 (1986); *see also State v. Amos,* 152 Wis. 2d 257, 270, 450 N.W.2d 503 (Ct. App. 1989). *See also, La Fournier,* 91 Wis. 2d at 71. "Where the first officer in rendering assistance to the victim could not preserve that evidence, an immediate entry by other officers without warrant, restricted in nature and scope to securing the evidence in plain view, was lawful."

somehow revoked after the fact because the identities of the agents remain concealed during the actual arrest and seizure.

Mr. Johnston next claims error in that he was found guilty of both selling and giving away alcohol in an attempt to evade the law. As noted above, Mr. Johnston was convicted on one count of selling alcoholic beverages to underage persons in violation of· sec. 125.04(1), Stats., and one count of evading the law by giving away fermented malt beverages contrary to sec. 125.315(1), Stats., both misdemeanors. Mr. Johnston contends that the two charges are mutually exclusive. He claims that while he might be found guilty of one or the other charges, in the alternative, he cannot be convicted of doing both at the same time. Therefore, he claims that it was error by the circuit court to instruct the jury such that it could convict on both counts. He also claims that there was insufficient evidence to allow a conviction on both counts.

We readily grant that it is logically impossible for both charges to occur simultaneously with regard to any single transaction. One cannot both sell and give away the same object in the same transaction. However, as soon as there are two or more transactions, whether involving two or more persons or two or more transactions with a single person, it is no longer impossible for one to violate both sections in the series of transactions. This is precisely how the circuit court and the court of appeals viewed the question and we agree with them. Thus, since the two charges are not necessarily mutually exclusive, the court was not in error to give instructions which allowed for conviction on both counts.

Mr. Johnston also claims that there was insufficient evidence to convict on both counts. In reviewing a claim of insufficient evidence to support a judgment entered on the jury verdict, we view the evidence in a light most favorable to the verdict. *See, State v. Poellinger,* 153 Wis. 2d 493, 501, 451 N.W.2d 752 (1990). We will affirm the judgment unless the evidence is so insufficient in probative value and force that it can be said as a matter of law that no trier of fact, acting reasonably, could have found guilt beyond a reasonable doubt. *Id.*

While continuing to maintain that he neither sold nor gave away any beer, Mr. Johnston argues in his brief to this court that "the evidence showed that [he] employed a single scheme," and, therefore, he could be guilty of only one charge or the other, but not both. His argument is as follows: On the one hand, Mr. Johnston maintains that he is not guilty for selling beer under sec. 125.04(1), Stats., because his statement about taking the money "for the music" was true. On the other hand, he contends that he is not guilty of attempting to evade the law under sec. 125.315(1), Stats., because his statement about taking the money "for the music" and not for the beer was not believed by any of the party-goers. After characterizing this party as "no different than the company picnic or the family reunion, or the block party where all the party-goers get together and take donations," Mr. Johnston, through his attorney, argued to the jury in the closing argument at trial that he could not be found guilty of evading the law because the statement about taking the money "for the music" was not believed by the witnesses.

Two witnesses testified that after they received the cup for beer, after they paid three dollars to

818

receive a cup for beer, the defendant said, 'Oh, by the way, the money's for music.'

In fact, both witnesses testified that it was their opinion it was for the beer. They never believed a word he said. They paid the money, got the cup, then went and got beer. That is what the state claims Mr. Johnston did to evade the statute.

Another witness for the state, an Officer Russell from the Appleton Police Department, testified that while she was observing the defendant downstairs, different people came in. Gave him three dollars. He said, 'Here is your cup and the beer's over there.' Never told them it's for music.

I do not believe the state has proved its case beyond a reasonable doubt regarding that count three. The state has not shown that Mr. Johnston was in any way using any means to evade the laws of the statute by giving away beer or selling the music, as the state claims.

Similarly, in his brief before this court Mr. Johnston argues that he could not be guilty of attempting to evade the law because his statement about the money being "for the music" and not for the beer was not believable to those attending the party.

"The testimony of the witnesses also demonstrated that a single scheme was at work here. All of the undercover agents were told that they had to pay three dollars apiece and were then given a glass. Two of the officers heard Mr. Johnston explain that the money was for the music. But all of them assumed the money was for the beer. Another witness who attended the party testified simply that she paid three dollars and got a cup, but that no one told her what the money was for. Thus, although various witnesses recalled different aspects of Mr. Johnston's patter at the party, no witness testified

that Mr. Johnston was selling beer to some individuals and music or something else to others to evade the law. All witnesses believed that they were paying money to drink beer."

We reject this argument. First, the testimony indicates that Mr. Johnston demanded money from all the party-goers, but that Mr. Johnston was not always clear whether the money was for the beer or for something else. Two of the undercover officers were told that the money was not for the beer, but was "for the music." The third officer was told that the money was "for the cup." The civilian agent was not given any explanation of why the money was demanded, but understood that it was for the beer. Owing in part to the variety of explanations, the court of appeals concluded that there was credible evidence upon which the jury could have found that Mr. Johnston was selling beer to some individuals while giving it away to others. We agree.

Second, Mr. Johnston is mistaken to suggest that it is the witnesses who must form the ultimate conclusion about his intent and truthfulness. The witnesses only reported what they saw or were told by Mr. Johnston. Rather it is the jury which must either believe or disbelieve Mr. Johnston, and it is the jury which must decide whether he both sold beer to some party-goers, contrary to sec. 125.04(1), Stats., and also intended to evade the laws, per sec. 125.315(1), Stats. The question under sec. 125.315(1), is not whether the witnesses believed Mr. Johnston's attempted evasion, but, as the jury was instructed, whether Mr. Johnston intended to evade the law. The jury believed that Mr. Johnston had the requisite intent and found accordingly.

We cannot say that the jury acted irrationally in returning the verdict it did. Once Mr. Johnston

employed the fiction about the money being for something other than the beer, he was risking that he might be believed in part and not believed in part. The "logic" of Mr. Johnston's "single scheme," as he refers to it, broke down as soon as he varied his "patter" to the party-goers. Since it was Mr. Johnston's own choice to employ this "scheme," he has only himself to blame for the variations in delivery as the scheme was applied to the different party-goers. Owing to the nature of the deception and the variations in Mr. Johnston's story, the jury had sufficient evidence to convict on both counts. Under these circumstances, we have no qualms about allowing Mr. Johnston to be "hoist on his own petard."

The third claim raised by Mr. Johnston is that the state improperly joined the civil forfeiture charge and the criminal misdemeanor charges in the same complaint. Mr. Johnston was convicted of two criminal misdemeanor charges and was found guilty of a civil forfeiture violation under sec. 125.07(1), Stats.

Mr. Johnston failed to object to the joinder of these charges at the circuit court level. He now claims that the circuit court lacked jurisdiction to try the civil forfeiture charge along with the criminal misdemeanor charges and he argues that the joinder was impermissible because the civil and criminal charges involve different procedural rules as well as different burdens of proof.

We conclude that there were no jurisdictional defects created by the joinder of the civil forfeiture and criminal misdemeanor charges in this case. Section 778.01, Stats., provides in relevant part: "Where a forfeiture imposed by statute shall be incurred it may be recovered in a civil action unless the act or omission is

punishable by fine and imprisonment or by fine or imprisonment." Section 125.07(1), Stats. is punishable only by forfeiture. Therefore, we conclude that the legislature has allowed that such a forfeiture may be sought in a civil action, and the legislature has not precluded that such a forfeiture be sought in conjunction with criminal charges.

We agree with the court of appeals. The court of appeals held that the conviction for the civil forfeiture should not be overturned unless the alleged error affected some "substantial right" of Mr. Johnston. *Johnston,* 178 Wis. 2d at 39–40. "Assuming *arguendo* that joinder was improper," the court explained, "we hold that such error did not affect any of Johnston's substantial rights." *Id.* We agree that none of Mr. Johnston's substantial rights were affected.

Mr. Johnston argues that his substantial rights were affected because the different burdens of proof between the civil and criminal charges were "commingled" in the jury instructions. We disagree. We conclude, as did the court of appeals, that at no time were the burdens of proof commingled. The judge explained the jury instructions clearly and with meticulous care. The separate nature of the charges and the separate burdens of proof were carefully explained no less than four times to the jury. Juries are presumed to follow the instructions given them, and we find no indication on this record that Mr. Johnston's substantial rights were adversely affected by the joinder of the civil forfeiture and the criminal misdemeanor charges in this trial.

We also conclude that Mr. Johnston waived this issue. Mr. Johnston was given ample opportunity to object to the jury instructions, but did not. His only

request of the circuit court was that the court instruct the jury separately for the civil forfeiture count, which was done. Under the circumstances of this case, Mr. Johnston's failure to make timely objection serves as a waiver of the issue. *See, State v. Zelenka,* 130 Wis. 2d 34, 43, 387 N.W.2d 55 (1986).

Mr. Johnston's final argument is that the circuit court erred when it denied his motion to modify his sentence because of his good behavior while his case was pending on appeal. We reject his argument and affirm the circuit court's dismissal of his motion.

Immediately upon being convicted and sentenced, Mr. Johnston filed his intent to seek postconviction relief. He also filed a motion requesting release from jail pending his appeal. The circuit court accepted the motion and ordered Mr. Johnston released from jail "pending the outcome of the appeal in this case."

Several months later, while the appeal was still pending, Mr. Johnston filed a motion for sentence modification under sec. (Rule) 809.30(2)(h), Stats. He claimed that his sentence should be reduced because he had "turned around his life" while his appeal was pending.

The circuit court held a hearing to determine whether there were grounds to modify Mr. Johnston's sentence. It found none. The circuit court acknowledged the changes in Mr. Johnston's life, but concluded that these changes were, in the court's words, "irrelevant," and denied the motion for sentence modification. We agree.

*By the Court.*—The decision of the court of appeals is reversed.

JANINE P. GESKE, J. *(dissenting)*. I dissent from that portion of the majority opinion which concludes that the warrantless search of Johnston's home and the seizure of the evidence found in his home do not violate his fourth amendment rights. The basis for the majority's conclusion is that the consent for entry given to undercover officers somehow also extended to uniformed police, who made a subsequent entry into Johnston's home. I disagree and conclude that the consent to enter Johnston's home, obtained by undercover police using a ruse, did not extend to a distinctly separate and warrantless entry by uniformed officers, without some exception to the warrant rule. For example, exigent circumstances or actual consent by Johnston would have authorized such an entry. However, the majority has failed to show that any exception was present.

Warrantless entries by law enforcement officials into the privacy of one's home have been sanctioned in only " 'a few specifically established and well-delineated' situations." *Vale v. Louisiana,* 399 U.S. 30, 34 (1970) (quoting *Katz v. United States,* 389 U.S. 347, 357 (1967)). One such exception is the presence of exigent circumstances,[1] which may include an emergency situation at a residence, a belief that evidence is being destroyed or removed from the jurisdiction, or a situation where officials are in hot pursuit of a felon.

No exigent circumstances existed at the Johnston residence to justify the warrantless entry by the uniformed police. The beer party was just getting underway when undercover officials gained access; the

---

[1] *See also Coolidge v. New Hampshire,* 403 U.S. 443, 474–75 (1971) (a warrantless search of one's home is *per se* unreasonable absent a carefully defined exception based on the presence of exigent circumstances).

number of people present increased from fifteen or twenty to approximately fifty. Additionally, all of the paraphernalia associated with the serving of beer, including the kegs, cups, and money from alleged sales, was not in danger of being destroyed. Finally, the police officer in charge of the investigation testified that several days prior to the party, he received a tip that underage drinking parties previously had occurred at the Johnston home. On the night of the party at issue, the undercover officers arrived at the Johnston home around 6:30 p.m. They were told by Johnston himself that they should return in an hour when the beer would be set up and available in the basement. This information certainly could have served as a basis for a search warrant request.

Another exception to the warrant requirement is consent. Consent searches often serve as a means to investigate suspected criminal behavior, especially when probable cause may be lacking to provide the foundation for a warrant. *See* 1 Wayne R. LaFave & Jerold H. Israel, *Criminal Procedure* sec. 3.10 at 340 (1984). The issue as to whether a consent to search results from the consenting party's voluntary action or whether the waiver of a constitutional right is implicated was addressed in *Schneckloth v. Bustamonte,* 412 U.S. 218, 248–49 (1973), wherein the United States Supreme Court held:

> [W]hen the subject of a search is not in custody and the State attempts to justify a search on the basis of his consent, the Fourth and Fourteenth Amendments require that it demonstrate that the consent was in fact voluntarily given, and not the result of duress or coercion, express or implied. Voluntariness is a question of fact to be determined from all the circumstances, and while the subject's knowl-

edge of a right to refuse is a factor to be taken into account, the prosecution is not required to demonstrate such knowledge as a prerequisite to establishing voluntary consent.

The subjects of the search in *Schneckloth* were approached by uniformed police. The consent in that situation differed significantly from what occurred in the present case. Johnston was not aware of the true identity of the undercover officers. Rather, he gave the undercover group permission to enter his home based upon the fact that the civilian agent in the group was an acquaintance of his brother. It was at the point of the second entry by uniformed police, not the first by the undercover officers, that Johnston's fourth amendment rights were implicated.

The majority relies upon the cases of *Lewis v. United States,* 385 U.S. 206 (1966), and *United States v. Scherer,* 673 F.2d 176 (7th Cir. 1982), for the proposition that "[a] government agent may obtain an invitation onto property by misrepresenting his identity, and if invited, does not need probable cause nor warrant to enter so long as he does not exceed the scope of his invitation." *Scherer,* 673 F.2d at 182. This is true, as it applies only to the undercover officers who were given permission by Johnston to enter his home, and who did not expand their search of the premises beyond the locus of the beer party.[2]

---

[2] In its opinion, the majority quotes the court of appeals as saying:

> A general principle in Wisconsin is that additional officers may enter an individual's home after one officer has been legally admitted provided that they do not expand the scope or intensity of the search.

*State v. Johnston,* 178 Wis. 2d 20, 32, 503 N.W.2d 346 (Ct. App. 1993) (citing *State v. Pires,* 55 Wis. 2d 597, 604–05, 201 N.W.2d

However, the consent for entry did not extend to the uniformed police officers. Even if Johnston's expectation of privacy "could be unknowingly waived by the presence of an undercover officer, this cannot realistically be construed as a waiver of expectations of privacy as to 'a class of persons whose very existence is unknown' to [him]." *State v. Dugger,* 12 Wash. App. 74, 79, 528 P.2d 274, 276–77 (1974) (quoting *State v. Darroch,* 8 Or. App. 32, 39, 492 P.2d 308, 311 (1971) (Fort, J., dissenting)). Therefore, I disagree with the majority's reliance on *United States v. Paul,* 808 F.2d 645 (7th Cir. 1986), because it is used to create a second consent where only one was given. In *Paul,* a confidential informant for federal drug authorities arranged to

---

153 (1972)). However, I do not believe that *Pires* stands for that proposition. In *Pires,* the defendant's husband called for a police ambulance, stating that his infant child was dead and his wife was having a nervous breakdown. The ambulance took Pires, his wife, and infant to the hospital. No items from the home were removed by the police at that time, and Pires gave no one else permission to enter. *Id.* at 600–01. When the police arrived, in response to a radio dispatch, they found no one at home. Finding the back door unlocked, they entered and searched for the victims. Later, after learning that the defendant and infant were in the hospital, apparent victims of a drug overdose, the police returned to the home and searched for inculpatory evidence. *Id.*

The first entry by the police was justifiable under the exigent circumstances exception to the warrant requirement. However, the second entry could not be justified because

> [a]fter the officers had determined no one was present, victim or otherwise, the application of the 'emergency rationale' terminated. Any further search beyond this point, unless further steps are taken to independently satisfy constitutional mandates, is unconstitutional.

*Id.* at 606–07.

buy a bale of marijuana from the defendant. The informant was to gain access to Paul's home and, when he saw the marijuana, send an electronic signal to the federal agents waiting outside the home. When the sale transpired, the signal was sent, and the agents entered the home. The federal agents, however, testified that they did not request a warrant because (a) until the informant signaled them, they did not have probable cause to believe marijuana was in the house, and (b) they could not satisfy the warrant particularity requirement, since they were not sure which building on Paul's farm would be the locus of the drug sale. The Seventh Circuit concluded that the officers already possessed enough detailed information about Paul to obtain a warrant. Additionally, they did not have to execute the warrant unless or until the drug sale occurred. The decision chides the government for its failure to obtain a warrant in this case and concludes that the search did not fall within the emergency exception under *Payton v. New York,* 445 U.S. 573 (1980). Instead, the court creatively authorized the entry on an alternative ground of consent—"consent once removed"—and held that once the undercover informant was granted permission to enter Paul's home and saw the marijuana, the consent extended to the federal agents who entered, arrested. Paul and seized the drugs.[3]

---

[3] Support for this concept was drawn from *United States v. Janik,* 723 F.2d 537 (7th Cir. 1983). The *Paul* court states the *Janik* holding as the following:

[W]hen one invites an undercover agent into his house, the agent can summon other agents to assist in the arrest, and the other agents are not guilty of a violation of the Fourth Amendment.

*Paul,* 808 F.2d at 648. Interestingly, an examination of the *Janik* decision reveals that no such holding was stated. Janik, a

The majority has failed to articulate the exception to the warrant requirement on which it relies. On the one hand, the majority states that Johnston consented to the entry of the uniformed police when he consented to the entry of the undercover agents. However, the consent to the agents, who used a ruse, extended only to them. Johnston still maintained an expectation of privacy as to anyone else who wished to enter his home.

Further, the majority also attempts to apply the exception of exigent circumstances when it states that the uniformed police entered Johnston's home only to provide assistance or backup. However, there were no exigent circumstances. The undercover agents did not face a perilous situation in the Johnston basement nor was any of the evidence which the undercover agents themselves could have seized in danger of being destroyed.

The second round of officers entered Johnston's home without a warrant. The state failed to establish an exception to the warrant requirement. For these reasons, I respectfully dissent.

---

deputy sheriff in Cook County, Illinois, told a friend, Heidemann, about a submachine gun he had purchased from a known burglar. Janik knew that Heidemann was a Chicago police officer when he invited Heidemann into his home to see the gun. However, at that point Janik was unaware that Heidemann was working with federal agents regarding this unregistered weapon.

The *Janik* court stated that

> [a] guest who stays within the part of the premises to which he is invited does not invade his host's privacy. . . . [A]rresting officers [may] seize things in plain view without either a warrant or a justification for not having one. . . . The fact that Heidemann got help from other officers in removing the submachine gun can make no difference. . . .

*Janik,* 723 F.2d at 548 (citations omitted).

I am authorized to state that Chief Justice NATHAN S. HEFFERNAN and Justice SHIRLEY S. ABRAHAMSON join this dissenting opinion.