STATE of Wisconsin, Plaintiff-Respondent,

v.

Robert TORRES, Defendant-Appellant.†

Court of Appeals

*No. 2016AP1061–CR. Submitted on briefs May 2, 2017.
—Decided August 30, 2017.*

2017 WI App 60

(Also reported in 902 N.W.2d 543.)

† Petition for Review Filed.

On behalf of the defendant-appellant, the cause was submitted on the briefs of *Erin K. Deeley* and *John R. Breffeilh*, assistant state public defenders, Milwaukee.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *Tiffany M. Winter*, assistant attorney general, and *Brad D. Schimel*, attorney general.

Before Neubauer, C.J., Gundrum and Hagedorn, JJ.

¶ 1. GUNDRUM, J.   Robert Torres appeals from his judgment of conviction and the denial of his motion

to suppress evidence obtained following law enforcement officers' warrantless entry into his residence. He asserts the entry was unlawful and all evidence flowing from it must be suppressed. Because we conclude the entry was justified by the existence of probable cause and exigent circumstances, we disagree and affirm.

### *Background*

¶ 2.   An evidentiary hearing was held on Torres' suppression motion at which two City of Racine police officers collectively provided the following relevant evidence.

¶ 3.   The officers were dispatched to a duplex for a call of "narcotics in progress." At the duplex, they spoke on the porch with the complainant, K.L., who resided in the lower unit. K.L. told the officers an odor of marijuana was "coming into" her unit from the upper unit and that she was concerned for the health of her two young children. She invited them to enter her unit to smell the odor. K.L. told the officers that "an underage party [was] going on upstairs," she "observed them drinking alcohol on the upper porch," a "15 to 16–year-old male"—Torres—lived in the upper unit, and she "knew his mother and her boyfriend were out of town for several days." Inside K.L's unit, the officers smelled the odor of burnt marijuana.[1]

¶ 4.   K.L. told the officers that several individuals had already "run out of" the upper unit, and she believed it was because they had either heard her call her landlord about the situation or heard her tell her

---

[1] One of the officers described the odor of marijuana as being "pretty strong."

205

husband she was calling the police.[2] She told the officers she believed some individuals, including Torres, were still in the upper unit.

¶ 5.   Hearing the upper unit floor creak and then footsteps coming down the stairs by the front of the duplex, the officers went back onto the porch where they encountered a juvenile male, A.S., "flee[ing]" out the porch door for the upper unit.[3] The officers asked A.S. if he was the owner or renter of the upper unit and indicated they wanted to speak with the owner/renter. A.S. responded by stating that it was his friend's residence, offering to get his friend (Torres),[4] and

[2] The first officer testified that K.L. indicated "[s]he believed [the individuals in the upper unit] heard her call on the telephone and as she was on the phone [reporting the situation to her landlord] several juveniles . . . fled from the residence." The second officer testified that K.L. indicated that "she thought that the people upstairs . . . heard her when she was telling her husband she was calling the police. She observed several parties . . . run out of the residence."

[3] The circuit court found that A.S. "opened the door to the upstairs unit" and was "trying to flee the residence." These findings are supported by the testimony of the first officer that he went back out onto the porch because he was concerned "somebody else might try running out the front door," and that "[j]ust as [he] got out there," the door to the upper unit "flew open" and he "was confronted by" A.S. We also note that the circuit court's finding that A.S. was "trying to flee" from the upper unit is also consistent with the testimony as to the undisputed manner in which the other juveniles had previously departed from the upper unit as K.L. was reporting the situation to the landlord over the phone or around the time K.L. told her husband she was calling the police.

[4] Although there is some discrepancy between the testimony of the officers as to whether A.S. *offered* to go get Torres or whether one of the officers *told* him to do so, in his appellate briefing Torres accepts the position that A.S. "offered to get Mr. Torres." This is a reasonable position in that one of the officers

206

turning around and proceeding back up the stairs. One of the officers told A.S. they would follow him upstairs, and they then did so. When he reached the top of the stairs, A.S. "greatly picked up his speed and kind of darted into the dining room of the upper unit," causing the officers to order A.S. to stop. The officers ultimately entered the upper unit and discovered evidence of various crimes, leading to the charges in this case.

¶ 6. The circuit court denied the suppression motion and Torres was ultimately convicted and sentenced. He now appeals.

## *Discussion*

¶ 7. The issue for us to decide is whether the law enforcement officers lawfully entered the stairwell leading to the upper unit of the duplex.[5] Torres contends the warrantless entry was unlawful because when the officers entered they did not have probable cause to believe the residence contained evidence of a crime and exigent circumstances did not exist.[6] We disagree.

---

testified unmistakably that when asked if the upper unit was his, A.S. responded, "No, it's my friend's apartment, I'll go get him."

[5] Before the circuit court, Torres also challenged the officers' protective sweep of his residence. He has abandoned that issue on appeal.

[6] The circuit court ultimately denied Torres' suppression motion on the basis that the police were properly performing their function as community caretakers. Because we uphold the court's ruling on the basis that there was probable cause to believe evidence of a crime would be found in the residence and exigent circumstances existed justifying the officers' entry without a warrant, we need not decide whether their entry was also justified based upon the community caretaker doctrine. *See Hegwood v. Town of Eagle Zoning Bd. of Appeals*, 2013 WI

¶ 8.　As we stated in *State v. Parisi*, 2014 WI App 129, 359 Wis. 2d 255, 857 N.W.2d 472:

> Warrantless entry into a residence is generally prohibited by the Fourth Amendment to the United States Constitution. An exception to this rule allows for such entry where there is probable cause to believe evidence of a crime will be found in the residence and there is "a risk that evidence will be destroyed" if time is taken to obtain a warrant, i.e., an exigent circumstance. "In such instances, an individual's substantial right to privacy in his or her home must give way to the compelling public interest in effective law enforcement." The test for whether an exigent circumstance existed is an objective one—"whether a police officer, under the facts as they were known at the time, would reasonably believe that delay in procuring a search warrant would . . . risk destruction of evidence."

*Id.*, ¶ 9 (citations omitted). It is the state's burden to show that an entry without a warrant is "both supported by probable cause and justified by exigent circumstances." *State v. Robinson*, 2010 WI 80, ¶ 24, 327 Wis. 2d 302, 786 N.W.2d 463. When reviewing an order granting or denying a motion to suppress evidence, we uphold a circuit court's findings of historical fact unless they are clearly erroneous, but "we independently apply constitutional principles to those facts." *Id.*, ¶ 22.

*Probable Cause*

¶ 9.　"The quantum of evidence required to establish probable cause to search is a 'fair probability' that

App 118, ¶ 1 n.1, 351 Wis. 2d 196, 839 N.W.2d 111 (we need not address other issues when one is dispositive).

contraband or evidence of a crime will be found in a particular place." *State v. Hughes*, 2000 WI 24, ¶ 21, 233 Wis. 2d 280, 607 N.W.2d 621; *see also Robinson*, 327 Wis. 2d 302, ¶ 3 (concluding officers had probable cause to search because evidence of illegal drug activity "would probably be found" in the place to be searched). Our supreme court has held that the "unmistakable odor of marijuana coming from [a suspect's] apartment provide[s] this fair probability." *Hughes*, 233 Wis. 2d 280, ¶ 22. Similarly, here, the unmistakable odor of marijuana coming from the upper unit of the duplex provided "a 'fair probability' that contraband or evidence of a crime [would] be found" there. *See id.*

■

¶ 10. Here, the officers testified that they were dispatched to the duplex for "narcotics in progress." Upon arrival, complainant K.L. informed them there was an underage party going on in the upper unit, an odor of marijuana was "coming into" her unit from that upper unit, and she was concerned for the health of her two young children. Invited into her unit, the officers themselves both smelled the odor of burnt marijuana. Under the undisputed circumstances of this case, any reasonable officer would find it extremely unlikely that K.L. would have called the police to her residence in the first place—much less invited them into her home to detect the odor of marijuana—if the marijuana was being used in her lower unit. The officers made the only conclusion they reasonably could have made— that the odor of burnt marijuana was emanating from the upper unit, just as K.L. had explained. Based upon these facts, as in *Hughes*, here there was a "fair probability" evidence of a crime—at a minimum, the possession of marijuana—would be found in the upper

unit. Thus, the officers had probable cause to search the residence for evidence of such crime.[7]

*Exigent Circumstances*

¶ 11.   Torres alternatively contends that even if the officers had probable cause to believe evidence of a crime would be found in his upper unit, "there were no exigencies" to justify their entry without a warrant. Again, we disagree.

¶ 12.   K.L. told the officers that several individuals had already "run out of" the upper unit and that she believed it was because they had either heard her call her landlord about the situation or heard her tell her husband she was calling the police. She told the officers she believed some individuals, including Tor-

---

[7] The first officer also testified that he smelled the odor of marijuana in the stairwell to the upper unit when A.S. opened the door to exit from that unit. Discussing the time period when the officer was still speaking with A.S. on the porch by the door *before* entering the stairwell to the upper unit, counsel for Torres asked the officer if he could "smell [marijuana] on" A.S. The officer testified:   "I smelled it in the back hallway." Counsel followed with:   "The back hallway or the front hallway?" The officer responded:   "The hallway going up, the stairs going up." Counsel then stated:   "Okay. So you smelled it downstairs. But you also smell it in the hallway as you go upstairs?" The officer responded, "Right." From this exchange, it is clear (and undisputed) that the officer smelled the odor of marijuana emanating from the upper unit stairwell *prior* to entering that stairwell (in addition to *also* smelling the odor as he went up the stairs). That said, while this unquestionably supports our determination that the officers had probable cause to enter the stairwell and search the upper unit for evidence of illegal drugs, we conclude that the officers had probable cause even before A.S. opened the porch door.

res, were still in the upper unit. Hearing the upper unit floor creak, the first officer went back out to the front porch because he was concerned "somebody else might try running out the front door." The second officer testified that they heard footsteps coming down the upper unit stairs by the front of the house. The circuit court found that A.S. was "trying to flee" from the upper unit, and we accept this finding as it is not clearly erroneous. *See supra* note 3. The officers asked A.S. if he was the owner/renter of the upper unit and indicated they wanted to speak with the owner/renter. A.S. responded by stating it was his friend's residence, offering to get his friend (Torres), and turning around and proceeding back up the stairs. One of the officers told A.S. they would follow him upstairs, and they then did so.

¶ 13. "The test for whether an exigent circumstance existed is an objective one—'whether a police officer, under the facts as they were known at the time, would reasonably believe that delay in procuring a search warrant would . . . risk destruction of evidence.' " *Parisi*, 359 Wis. 2d 255, ¶ 9 (quoting *Hughes*, 233 Wis. 2d 280, ¶ 24). The facts of this case satisfy that test.

■

¶ 14. To begin, we note here that the smell of burnt marijuana itself indicated evidence was being destroyed through the process of burning. *See id.*, ¶ 10 ("Our supreme court has held that the smell of burning marijuana gives 'rise to a reasonable belief that the drug—the evidence—was likely being consumed by the occupants and consequently destroyed.' " (citing *Hughes*, 233 Wis. 2d 280, ¶ 26)). However, an even greater exigency is

the possibility of the intentional and organized destruction of the drug by the apartment occupants once they were aware of the police presence outside the door. Marijuana and other drugs are highly destructible . . . . It is not unreasonable to assume that a drug possessor who knows the police are outside waiting for a warrant would use ·the delay to get rid of the evidence.

*Hughes*, 233 Wis. 2d 280, ¶ 26; *see also Robinson*, 327 Wis. 2d 302, ¶ 31 ("Drugs like marijuana are easily and quickly destroyed.").

¶ 15.   The risk was significant that if the officers had permitted A.S. to proceed up the stairs unaccompanied, he would have engaged in "the intentional and organized destruction of the drug," perhaps assisted by others. *See Hughes*, 233 Wis. 2d 280, ¶¶ 26, 39. The officers had already been informed that others had fled the residence as K.L. was calling the landlord regarding the situation and possibly in response to her informing her husband she was calling the police. Furthermore, when the officers encountered A.S. on the porch, he too was "trying to flee" from the upper unit. Had the officers not accompanied A.S. upstairs but instead waited downstairs for him to (maybe) retrieve Torres, A.S. easily could have proceeded to destroy evidence, potentially joined by anyone else in the residence, such as Torres, whom both A.S. and K.L. had indicated was still in the upper unit. An officer could reasonably believe that a juvenile who is attempting to flee from a residence when officers are on the property and "the odor of burning marijuana is in the air is more likely to also attempt to prevent evidence from being discovered by the police, including through the destruction of such evidence." *See Parisi*, 359 Wis. 2d 255, ¶ 13.

212

¶ 16. In *Hughes*, our supreme court held that exigent circumstances exist where there is a strong odor of marijuana emanating from a residence and occupants simply become aware of police outside the door. *Hughes*, 233 Wis. 2d 280, ¶¶ 1, 27, 35 (adding that in such circumstances the occupants "ha[ve] every incentive to intentionally destroy evidence" and the likelihood that they will do so is "extremely high"). With A.S. turning around and beginning to head back up the stairs, both of those factors are present in this case. Here, however, we also have the added factor that A.S. was in the process of attempting to flee from the unit from which the marijuana odor was emanating, even further supporting the very real concern that if permitted to go upstairs unaccompanied, he may very well destroy evidence.

¶ 17. Torres cites to our decision in *Kiekhefer* for his contention that "[t]he warrantless entry into [his] home did not fall within the scope of the exigent circumstances exception." *Kiekhefer* does not aid Torres.

¶ 18. In *Kiekhefer*, we found unlawful the officers' unannounced entry into Kiekhefer's bedroom after they detected the odor of burning marijuana coming from behind the closed bedroom door. *State v. Kiekhefer*, 212 Wis. 2d 460, 466, 474–75, 569 N.W.2d 316 (Ct. App. 1997). As we noted in *Parisi*, however, in *Kiekhefer* there was " 'no indication that Kiekhefer was aware' of the officers' presence outside his door," *Parisi*, 359 Wis. 2d 255, ¶ 16 (citing *Kiekhefer*, 212 Wis. 2d at 477), with the implication being that in such a circumstance there was no risk of the destruction of evidence if the officers waited for a warrant. *See also Hughes*, 233 Wis. 2d 280, ¶ 28 (distinguishing *Kiekhefer* because Kiekhefer "was in his room appar-

ently unaware of [the police officers'] presence until they entered without a warrant"). Furthermore, our decision in *Kiekhefer* was also based upon our conclusion that the suspected contraband in that case—"a large quantity of marijuana"—"could not be easily or quickly destroyed in Kiekhefer's bedroom." *Kiekhefer*, 212 Wis. 2d at 478. In *Parisi*, we distinguished the factual situation before us in that case from that before us in *Kiekhefer* because in *Parisi*, "the occupants would have had an entire apartment, presumably including sinks and toilets, to utilize for destruction of the suspected marijuana." *Parisi*, 359 Wis. 2d 255, ¶ 17. Unlike the situation in *Kiekhefer*, in this case, when A.S. turned around and proceeded upstairs, he was well aware of the officers' presence and with that knowledge was headed to the location where evidence of criminal activity was likely located. Also unlike the situation in *Kiekhefer* but akin to the situation in *Parisi*, here A.S. and anyone else in the upper unit "would have had an entire apartment, presumably including sinks and toilets, to utilize for destruction of the suspected marijuana." *See Parisi*, 359 Wis. 2d 255, ¶ 17.

■■■■■■

¶ 19. "In deciding whether actions are permissible under the Fourth Amendment, we need only determine that the actions of law enforcement were reasonable." *Hughes*, 233 Wis. 2d 280, ¶ 23. Furthermore, "[o]ur review of the exigent circumstances is 'directed by a flexible test of reasonableness under the totality of the circumstances.'" *State v. Phillips*, 2009 WI App 179, ¶ 8, 322 Wis. 2d 576, 778 N.W.2d 157 (quoting *State v. Smith*, 131 Wis. 2d 220, 229, 388 N.W.2d 601 (1986)).

¶ 20.   At the moment A.S. turned and proceeded up the stairs, the officers were faced with the immediate choice of either permitting A.S. to continue to the upper unit unaccompanied, accompanying him up the stairs as they did, or detaining him for an unknown length of time and preventing him from contacting Torres (so that Torres would not be clearly alerted to the police presence at the door) while they pursued a warrant or knocked on Torres' door in an attempt to have Torres promptly produce himself. There is no indication here that had A.S. not chosen to turn around and begin heading up the stairs that the officers would have decided on their own to ascend the stairs without a warrant. Torres has presented us with no case law, and we are aware of none, indicating that when faced with a choice similar to the one the officers faced here, a law enforcement officer acts unreasonably by making the split-second determination to follow the individual into the residence in order to prevent the otherwise likely destruction of evidence, as opposed to taking the alternative constitutionally challengeable action of detaining the individual. We conclude the officers acted reasonably in how they responded to the exigent circumstance they faced when A.S. turned and began heading toward the upper unit.

¶ 21.   For the foregoing reasons, we conclude the officers had probable cause to enter and proceed up the stairwell without a warrant and exigent circumstances justified their decision to do so.

*By the Court.*—Judgment affirmed.

¶ 22. NEUBAUER, C.J. (*concurring*). I write separately only to highlight an aspect of the exigency issue. The reasonableness of the decision to immediately investigate the neighbor's report, rather than delay for

215

a period of time to obtain a warrant, is supported by the totality of circumstances faced by the officers. The police are called to a "narcotics in progress"; smell burning marijuana; have been contacted by the downstairs neighbor requesting assistance and expressing concern for her children's health; receive an eyewitness report of an underage drinking party involving the fifteen- to sixteen-year-old resident, Torres, whose mother and boyfriend were gone for days; are alerted to persons having already taken flight; confront a minor in mid-flight; and are advised that Torres and others are still upstairs. Although we do not decide this case on the basis of the community caretaker doctrine, it is not unreasonable for the officers to consider the ongoing hazardous nature of marijuana smoking and underage drinking, and the threat of bodily harm to those involved or nearby, in determining that prompt investigation was required. *See State v. Johnston*, 184 Wis. 2d 794, 816, 518 N.W.2d 759 (1994) (when considering the exigencies of a law enforcement operation, "we will not second-guess police tactics so long as the constitutional requirements are met.").

¶ 23.  Further pointing up the reasonableness of the officers' decision, given the decision to immediately investigate the complaint, the other option of knocking after encountering the fleeing minor would have resulted in the same exigent circumstances. As discussed, by that point, the officers had probable cause to search the residence for evidence of a crime. It was objectively reasonable to determine that knocking on the door would have resulted in the same risk of destruction of evidence as allowing the minor to return to the apartment unaccompanied. Rather than knowledge of the potential or even imminent arrival of the police evidenced by the fleeing minors, it was objec-

tively reasonable to believe that knocking would likely alert the inhabitants to the actual presence of the police. *See State v. Robinson*, 2010 WI 80, ¶ 30, 327 Wis. 2d 302, 786 N.W.2d 463 (exigency is an objective reasonable belief test).

¶ 24.  Here, the fleeing footsteps indicative of attempts to avoid detection of an ongoing crime, and justifying an exigent circumstances entry, were heard before, rather than after, a knock. *See id.*, ¶¶ 31–32 (upon police knocking on the door, the sound of fleeing footsteps created exigent circumstances).