STATE of Wisconsin,
Plaintiff-Respondent,

v.

Juiquin Anthony PINKARD,
Defendant-Appellant-Petitioner.

Supreme Court

*No. 2008AP1204–CR. Oral argument January 7, 2010.
—Decided July 15, 2010.*

2010 WI 81

(Also reported in 785 N.W.2d 592.)

For the defendant-appellant-petitioner there were briefs by *Richard L. Zaffiro,* Wauwatosa, and oral argument by *Richard L. Zaffiro.*

For the plaintiff-appellant the cause was argued by *James M. Freimuth,* assistant attorney general, with whom on the brief was *J.B. Van Hollen,* attorney general.

¶ 1. PATIENCE DRAKE ROGGENSACK, J. We review a decision of the court of appeals[1] affirming the circuit court's[2] amended judgment convicting Juiquin Anthony Pinkard (Pinkard) of possession of cocaine with intent to deliver. In upholding the judgment of conviction, the court of appeals affirmed the circuit

---

[1] *State v. Pinkard,* No. 2008AP1204–CR, unpublished slip op. (Wis. Ct. App. Apr. 21, 2009) (per curiam).

[2] The Honorable M. Joseph Donald of Milwaukee County presided.

court's denial of Pinkard's motion to suppress evidence seized from his bedroom subsequent to the officers' warrantless entry of his home based upon an anonymous tip that two individuals in Pinkard's house appeared to be sleeping next to drugs, money and drug paraphernalia and that the door to the residence was standing open. The dispositive issues in this case are whether the officers' warrantless entry into Pinkard's home came about during the exercise of a bona fide community caretaker function, and if so, whether that function was reasonably exercised, thereby permitting the subsequent seizure of evidence that was in plain view. We conclude that under the circumstances of this case, the officers' warrantless home entry to ensure the health and safety of the occupants was undertaken as a bona fide community caretaker function, which was reasonably exercised. Accordingly, the officers lawfully seized evidence of a crime that was in plain view.

## I. BACKGROUND

¶ 2.  On August 24, 2006 at 8:55 a.m., City of Milwaukee Police Officer Mike Lopez (Lopez), received an anonymous tip in which the caller stated that he had just left 2439 South 7th Street, Pinkard's residence, in Milwaukee. The caller stated that inside that residence two people, "Big Boy" and his girlfriend, "Amalia," appeared to be sleeping; that located next to them was cocaine, money and a digital scale; and that the rear door to the residence was standing open. Lopez called City of Milwaukee Police Officer John Osowski (Osowski), a member of the Intelligence Division Gang Crimes Unit, on his cell phone and relayed what he had learned from the anonymous caller. Lopez further stated that he was concerned about the occupants of the residence. Lopez could not investigate the complaint

350

because of a prior engagement, so he asked Osowski if he would check on the occupants of the residence.

¶ 3.   Osowski received Lopez's call at 9:00 a.m. and afterward responded to Pinkard's residence,[3] which he admitted "sounded like a drug house," with four other police officers from the Gang Crimes Unit. Pinkard's residence is the rear unit of a three-family house. The officers went to the back entrance that Osowski explained is the "main door" to Pinkard's residence that leads exclusively to Pinkard's unit. This entrance had one heavy, aluminum door that was standing three-quarters open. Remaining outside Pinkard's residence, the officers knocked on the open door and announced their presence.

¶ 4.   After waiting 30–45 seconds and receiving no response, the officers then entered Pinkard's residence to "check the welfare of the occupants." Specifically, Osowski testified that they entered "[t]o make sure that the occupants that the caller had referred us were not the victims of any type of crime; that they weren't injured; that they weren't the victims of like a home invasion, robbery; that they were okay, and to safeguard any life or property in the residence."

¶ 5.   From the officers' position just inside the rear door, they could see a bedroom directly to their left. That bedroom door also was standing open. The officers could see two people inside the bedroom, Pinkard and a woman, who "appeared to be sleeping." The officers entered the bedroom "just to see if [they] could awake [the occupants]" and again loudly announced themselves as the police. Neither of the occupants in the bed

---

[3] It is unclear from the record how soon after Osowski received Lopez's call that he and his fellow officers arrived at Pinkard's residence. However, the parties agree that the officers arrived at approximately 9:00 a.m.

responded. The officers had to physically shake Pinkard to wake him. In plain view inside the bedroom, the officers seized cocaine, crack cocaine, marijuana and a digital scale. The officers then arrested Pinkard and seized a gun from underneath the mattress on which Pinkard had been sleeping.

¶ 6.  Pinkard was charged with possessing a firearm as a felon, possession of cocaine with intent to deliver as a second or subsequent offense and felony bail-jumping. Pinkard waived his preliminary hearing. He then filed a motion to suppress all of the evidence the officers seized from his residence arguing that the officers' warrantless entry into his residence violated his rights under the Fourth Amendment and Article I, Section 11 of the federal and state constitutions, respectively.

¶ 7.  At the suppression hearing, the circuit court implicitly found Osowski's testimony was credible because it found, as Osowski testified, that the officers arrived at Pinkard's residence "to inquire as to the health and safety of the individuals that were sleeping." The circuit court denied Pinkard's motion to suppress the evidence seized from in plain view, concluding that the officers' warrantless entry into Pinkard's residence was not unlawful because they were operating reasonably within their community caretaker function. However, the circuit court granted Pinkard's motion to suppress the gun seized from underneath his mattress because the court concluded the search went beyond the reasonable exercise of the officers' community caretaker function.

¶ 8.  Pursuant to a plea agreement that encompassed three other pending cases against Pinkard, he pled guilty in the present case to the possession of

cocaine with the intent to deliver and to felony bail-jumping. The charge of possession of a firearm as a felon was dismissed.

¶ 9. Pinkard moved for reconsideration of the circuit court's denial of his motion to suppress the evidence of drug possession seized from in plain view. In support of his motion, Pinkard attached two supplemental police reports, which he claimed demonstrated that the officers entered his residence "to commence a drug investigation, not because they were concerned about the occupants as community caretakers." The court denied Pinkard's motion, reiterating that the officers entered the residence as community caretakers.

¶ 10. Pinkard appealed the circuit court's "orders denying his suppression and related reconsideration motions." *State v. Pinkard*, No. 2008AP1204–CR, unpublished slip op., ¶ 4 (Wis. Ct. App. Apr. 21, 2009). The court of appeals affirmed. *Id.*, ¶ 1. Following our recent decision in *State v. Kramer*, 2009 WI 14, 315 Wis. 2d 414, 759 N.W.2d 598, the court of appeals concluded that the officers' actions based on the anonymous tip were "sufficient pursuant to *Kramer* to satisfy an articulation of an objectively reasonable basis to engage in a community caretaker function even if there [also] was a potential to exercise law enforcement functions during that investigation." *Pinkard*, No. 2008AP1204–CR, unpublished slip op., ¶ 10 (Wis. Ct. App. Apr. 21, 2009).

¶ 11. We granted review and now affirm.

## II. DISCUSSION

### A. Standard of Review

¶ 12. In reviewing the denial of a motion to suppress evidence, we will uphold a circuit court's findings

of historical fact unless they are clearly erroneous. *See State v. Fonte,* 2005 WI 77, ¶ 11, 281 Wis. 2d 654, 698 N.W.2d 594. However, we independently review the circuit court's application of constitutional principles to those facts. *State v. Arias,* 2008 WI 84, ¶ 11, 311 Wis. 2d 358, 752 N.W.2d 748. "Accordingly, we independently review whether an officer's community caretaker function satisfies the requirements of the Fourth Amendment and Article I, Section 11 of the federal and state Constitutions." *Kramer,* 315 Wis. 2d 414, ¶ 16 (citing *State v. Kelsey C.R.,* 2001 WI 54, ¶ 34, 243 Wis. 2d 422, 626 N.W.2d 777).

## B. Community Caretaker Function Exercised in a Residence

¶ 13. The federal and state constitutions do not protect against all searches and seizures, but only "unreasonable searches and seizures." *Arias,* 311 Wis. 2d 358, ¶ 25 (citing U.S. Const. amend. IV;[4] Wis. Const. art. I, § 11).[5] "The ultimate standard set forth in the Fourth Amendment is reasonableness." *Cady v. Dombrowski,* 413 U.S. 433, 439 (1973). "Subject to a few well-delineated exceptions, warrantless searches are deemed per se unreasonable under the Fourth Amendment." *State v. Faust,* 2004 WI 99, ¶ 11, 274 Wis. 2d 183, 682 N.W.2d 371; *Payton v. New York,* 445 U.S. 573,

---

[4] The Fourth Amendment of the United States Constitution provides in relevant part: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ."

[5] Article I, Section 11 of the Wisconsin Constitution provides in relevant part: "The right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures shall not be violated . . . ."

586 (1980) ("It is a basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable.") (internal quotations omitted).

¶ 14.   The United States Supreme Court and courts of this state have recognized that a police officer serving as a community caretaker to protect persons and property may be constitutionally permitted to perform warrantless searches and seizures. *See Cady*, 413 U.S. at 448; *State v. Ziedonis*, 2005 WI App 249, ¶ 14, 287 Wis. 2d 831, 707 N.W.2d 565. Because we "interpret the provisions of the Fourth Amendment and Article I, Section 11 as equivalent in regard to community caretaker analyses," we look to the United States Supreme Court's interpretation of the community caretaker exception to the Fourth Amendment's warrant requirement. *Kramer*, 315 Wis. 2d 414, ¶ 18.

¶ 15.   The community caretaker exception has its origins in *Cady*. In *Cady*, Dombrowski's car was disabled on the side of the road as the result of an accident. *Cady*, 413 U.S. at 443. Because the officers knew Dombrowski was a Chicago police officer and believed he was required to carry a service revolver at all times, the officers conducted a warrantless search of the vehicle "to protect the public from the possibility that a revolver would fall into untrained or perhaps malicious hands." *Id*. at 436, 443.

¶ 16.   The Court upheld the warrantless search, concluding that "[l]ocal police officers ... frequently investigate vehicle accidents in which there is no claim of criminal liability and engage in ... community caretaking functions, totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." *Id*. at 441. In so con-

cluding, the Court noted that " 'for the purposes of the Fourth Amendment there is a constitutional difference between houses and cars,' " explaining that a warrantless search of a car deemed reasonable may be unreasonable in the context of a search of a home. *Id.* at 439 (quoting *Chambers v. Maroney,* 399 U.S. 42, 52 (1970)).

¶ 17. In *South Dakota v. Opperman,* 428 U.S. 364 (1976), an officer conducted a warrantless "routine inventory search of an automobile lawfully impounded by police." *Id.* at 365. The Court upheld the warrantless inventory search, explaining that the officers were exercising a " 'community caretaking function[]' " in the interest of public safety. *Id.* at 368 (quoting *Cady,* 413 U.S. at 441). The Court explained that it "has consistently sustained police intrusions into automobiles impounded or otherwise in lawful police custody where the process is aimed at securing or protecting the car and its contents." *Id.* at 373. As in *Cady,* the Court in *Opperman* relied on the diminished expectation of privacy in automobiles as part of its rationale for permitting the officers' search to secure the car's contents. *Id.* at 368–69.

¶ 18. Officers may exercise two types of functions: law enforcement functions and community caretaker functions. *See Cady,* 413 U.S. at 441; *see also Kramer,* 315 Wis. 2d 414, ¶ 32. An officer exercises a community caretaker function "when the officer discovers a member of the public who is in need of assistance." *Kramer,* 315 Wis. 2d 414, ¶ 32.

¶ 19. Pinkard's interpretation limits law enforcement's community caretaker function to automobiles. Pinkard argues that *Cady* and *Opperman's* emphasis on the distinction between automobile searches and home searches and the heightened expectation of privacy in one's home suggests that a commu-

356

nity caretaker function is not sufficient to support a warrantless home intrusion.

¶ 20. First, we note that there is no language in *Cady* or *Opperman* that limits an officer's community caretaker functions to incidents involving automobiles.[6] We read *Cady* not as prohibiting officers from entering a residence without a warrant while exercising a community caretaker function, but instead as "coun-

---

[6] We are not alone in our interpretation of *Cady v. Dombrowski,* 413 U.S. 433 (1973), and *South Dakota v. Opperman,* 428 U.S. 364 (1976), and our conclusion that the community caretaker exception to the warrant requirement may be applied to residences. *See United States v. Rohrig,* 98 F.3d 1506, 1523, 1522 (6th Cir. 1996) (concluding that because "an important 'community caretaking' interest motivated the officers' entry," the officers' "failure to obtain a warrant [did] not render that entry unlawful" where officers entered defendant's home to "abat[e] an ongoing nuisance by quelling loud and disruptive noise"); *South Dakota v. Deneui,* 775 N.W.2d 221, 226, 239 (S.D. 2009) (noting that it was deciding "[i]n a case of first impression . . . whether the community caretaker doctrine . . . should also be applied to a home search" and concluding that the exception may be "invoked to justify law enforcement intrusion into a home"); *California v. Ray,* 981 P.2d 928, 934 (Cal. 1999) (concluding that the community caretaker doctrine did not apply, but noting that "[u]nder the community caretaking exception, circumstances short of a perceived emergency may justify a warrantless entry" of a home); *New Jersey v. Garbin,* 739 A.2d 1016, 1019, 1018 (N.J. Sup. Ct. 1999) (in concluding that the officers' warrantless entry into a garage was justified under the community caretaker exception, the court explicitly stated that the performance of community caretaking functions "may provide the requisite authority for entry into a private residence without a warrant"); *Virginia v. Waters,* 456 S.E.2d 527, 530 (Va. Ct. App. 1995) (noting that "no language in . . . *Cady* restricts an officer's community caretaking actions to incidents involving automobiles" and concluding that "an officer's community caretaker functions are not limited solely to automobile stops").

357

sel[ing] a cautious approach when the exception is invoked to justify law enforcement intrusion into a home." *South Dakota v. Deneui,* 775 N.W.2d 221, 239 (S.D. 2009); *see also United States v. Gillespie,* 332 F. Supp. 2d 923, 929 (W.D. Va. 2004) (citing *Cady,* the court explained that relying on the community caretaker exception to support a warrantless entry into a home is "more suspect" than when a community caretaker function is involved in the search of an automobile). Although a multitude of activities fall within the community caretaker *function,* not every intrusion that results from the exercise of a community caretaker function will fall within the community caretaker *exception* to permit a warrantless entry into a home. Whether a given community caretaker function will pass muster under the Fourth Amendment so as to permit a warrantless home entry depends on whether the community caretaker function was reasonably exercised under the totality of the circumstances of the incident under review.

¶ 21. Second, Wisconsin case law, dating back to our very first discussion of the community caretaker exception to the warrant requirement, supports our conclusion that the community caretaker exception may be applied to residences. In *Bies v. State,* 76 Wis. 2d 457, 251 N.W.2d 461 (1977), our first discussion of the community caretaker exception, a police officer received a radio message "directing him to investigate a noise complaint" near Bies' garage. *Id.* at 461. The officer walked around the garage and saw in plain view through the open rear doorway what he believed was stolen telephone cable. Without permission or a warrant, the officer seized the cable from inside the garage. *Id.* at 461–62. We noted that Bies' garage was located on the "curtilage of his dwelling, and it was not in any

sense a semi-public area" and, therefore, was "within the Fourth Amendment's protection." *Id.* at 462. In concluding that the officers' observation and seizure of the cable from Bies' garage were constitutionally permissible because the officer was exercising a bona fide community caretaker function, *id.* at 474, we explained that:

> Checking noise complaints bears little in common with investigation of crime. As a general matter it is probably more a part of the "community caretaker" function of the police . . . . The officer was clearly justified in proceeding to the alley in question and conducting a general surveillance of the area to determine whether some noise or other disturbance was present.

*Id.* at 471.

¶ 22. While *Bies* did not explicitly state that a bona fide community caretaker function may support a warrantless home entry, it necessarily implies such an interpretation. This is so because *Bies* involved an officer's warrantless entry of the curtilage of the defendant's residence, *id.* at 462, which "is actually 'considered part of the home itself for Fourth Amendment purposes,' " *State v. Martwick,* 2000 WI 5, ¶ 26, 231 Wis. 2d 801, 604 N.W.2d 552 (quoting *Oliver v. United States,* 466 U.S. 170, 180 (1984)).[7] It is well-settled that "[t]he protection provided by the Fourth Amendment to a home also extends to the curtilage of a residence." *Id.* (citing *Oliver,* 466 U.S. at 180).

---

[7] Without citing *State v. Bies,* 76 Wis. 2d 457, 251 N.W.2d 461 (1977), the dissent mistakenly asserts: "Further, like the Supreme Court, this court has never extended the exception to justify warrantless entry of a home. Never, until now." Dissent, ¶ 35. We disagree with the dissent's representation.

¶ 23. In *State v. Horngren*, 2000 WI App 177, 238 Wis. 2d 347, 617 N.W.2d 508, the court of appeals applied a community caretaker analysis to Horngren's motion to suppress evidence obtained in a warrantless entry of his home. *Id.*, ¶ 7. The police were dispatched to Horngren's apartment based on a reported suicide threat. *Id.*, ¶ 11. The court of appeals determined that police response based on their concern for the safety of an individual threatening suicide was a bona fide community caretaker function, reasonably undertaken. *Id.*, ¶ 14.

¶ 24. In *State v. Ferguson* (*Shane Ferguson*), 2001 WI App 102, 244 Wis. 2d 17, 629 N.W.2d 788, the court of appeals again applied a community caretaker analysis to the search of a residence. A 911 call that reported a fight at Ferguson's residence brought the police to the scene. *Id.*, ¶ 2. Upon their arrival, they encountered a teenage woman who was highly intoxicated. *Id.* The young woman unlocked her apartment and the police followed her inside where they observed two other teenagers who were also intoxicated. *Id.*, ¶¶ 3–4. They also saw several empty gallon containers for hard liquor and empty beer bottles, from which they surmised that the underage occupants had consumed a significant amount of alcohol. *Id.*, ¶ 4. During their review of the apartment, the police came upon a locked bedroom door. *Id.*, ¶ 5. They called out repeatedly, but received no response. *Id.* Based on their concern that someone inside may need assistance, they jimmied the lock and found Ferguson and marijuana plants. *Id.*

¶ 25. In applying the community caretaker analysis, the court of appeals explained that police presence at Ferguson's apartment was occasioned by a 911 call to report a fight, and that while at his apartment, they encountered underage drinking, which is not a crime. *Id.*, ¶ 13. Their concern in entering Ferguson's bed-

room was that an underage person may have passed out inside and was in need of assistance. *Id.*, ¶ 14. In concluding that the community caretaker function had been reasonably undertaken, the court of appeals balanced the public interest in providing assistance with Ferguson's interest in preventing the intrusion given the facts and circumstances presented. *Id.*, ¶ 20.

¶ 26. As the above examples show, where the community caretaker function has been held to have supported a warrantless home entry, Wisconsin courts have carefully examined the expressed concern for which the community caretaker function was undertaken to determine if it was bona fide. *Id.*, ¶ 14; *Horngren,* 238 Wis. 2d 347, ¶ 11. Then, the courts balanced the public interest in acting on the stated concern with the Fourth Amendment right to preclude unreasonable searches or seizures in one's home. *See Shane Ferguson,* 244 Wis. 2d 17, ¶ 20; *Horngren,* 238 Wis. 2d 347, ¶ 14. This analysis is consistent with the approach we took in *Bies* where entry into the curtilage was made without a warrant. *See Bies,* 76 Wis. 2d at 462, 474. We shall employ a similar analysis of the community caretaker function[8] currently under review.

---

[8] Some courts have mistakenly conflated the community caretaker exception and the emergency exception to the warrant requirement of the Fourth Amendment. *See, e.g., Garbin,* 739 A.2d at 1018–19 (holding that the officers' warrantless intrusion was justified under the community caretaker exception, but in setting forth the community caretaker exception, the court cited to and quoted from a series of emergency exception cases); *Maryland v. Alexander,* 721 A.2d 275, 281–84 (Md. Ct. Spec. App. 1998) (citing both emergency aid and community caretaker cases in discussing the community caretaker exception); *Massachusetts v. Bates,* 548 N.E.2d 889, 891 n.2 (Mass. App. Ct. 1990) (opining that the emergency exception is "[s]ometimes called the 'community caretaker exception' ");

¶ 27. Furthermore, the analysis of Wisconsin courts is also consistent with the approach taken by courts in other jurisdictions. *See Michigan v. Davis*, 497 N.W.2d 910, 919–20 (Mich. 1993); *Deneui*, 775 N.W.2d at

*Nevada v. Rincon*, 147 P.3d 233, 237 (Nev. 2006) (asserting that the community caretaker exception requires an "objectively reasonable belief that emergency assistance is needed").

However, the exceptions are not one and the same. The community caretaker exception does not require the circumstances to rise to the level of an emergency to qualify as an exception to the Fourth Amendment's warrant requirement. *See Cady*, 413 U.S. at 447–48 (invoking the community caretaker exception for the first time).

Confusion arises when an officer's conduct under the emergency exception is spoken of as "one of many 'community caretaking functions' of the police." Wayne R. LaFave, *Search and Seizure* § 6.6(a) n.6 (4th ed. 2004). Even though police conduct that falls within the emergency exception constitutes one of the many community caretaking functions, "it must be assessed separately and by a distinct test, as all such functions are not 'judged by the same standard.' " *Id.*; *accord Hunsberger v. Wood*, 570 F.3d 546, 554 (4th Cir. 2009) (noting that the community caretaker exception and the emergency exception "have different intellectual underpinnings") (internal quotations and brackets omitted). Stated otherwise, "the community caretaking *function* of police is an aspect of the emergency exception .... The community caretaker *exception*, however, is an independent and broader exception to the Fourth Amendment." *Deneui*, 775 N.W.2d at 251–52 (Meierhenry, J., dissenting).

Maintaining the distinction between the community caretaker exception and the emergency exception is important because the United States Supreme Court has recognized the application of the emergency exception, unlike the community caretaker exception, as justifying the warrantless entry of a home. *See Mincey v. Arizona*, 437 U.S. 385, 393–94 (1978).

We have consistently maintained the appropriate distinction between the two exceptions and have formulated distinct analyses for the two exceptions. *Compare State v. Boggess*, 115 Wis. 2d

239. Assisting members of the public in the context of automobiles is only one of many circumstances in which police officers may exercise their community caretaker function. We agree with the Supreme Court of South Dakota's recent statement that "homes cannot be arbitrarily isolated from the community caretaking equation. The need to protect and preserve life or avoid serious injury cannot be limited to automobiles." *Deneui,* 775 N.W.2d at 239.

## C. The Entry into Pinkard's Residence

¶ 28.  Because we have concluded that under certain circumstances a reasonably exercised community caretaker function may permit a warrantless entry into a home, we now determine whether the warrantless entry into Pinkard's residence was permissible under the Fourth Amendment.[9]

### 1. Three-step test

¶ 29.  We apply a three-step test to determine whether an officer's conduct properly falls within the scope of the community caretaker exception to the Fourth Amendment's warrant requirement. *Kramer,* 315 Wis. 2d 414, ¶ 21. When a community caretaker

443, 340 N.W.2d 516 (1983) (employing an emergency exception rationale) *with State v. Kramer,* 2009 WI 14, 315 Wis. 2d 414, 759 N.W.2d 598 (employing a community caretaker rationale). Before us, the State argued the emergency exception as an alternative rationale for the officers' warrantless entry into Pinkard's residence. Because we employ the community caretaker exception to resolve this case, we decline to address the emergency exception.

[9] Because we interpret Article I, Section 11 of the Wisconsin Constitution consistent with the Fourth Amendment for purposes of community caretaker analyses, *Kramer,* 315 Wis. 2d 414, ¶ 18, we have not repeated a reference to Article I, Section 11 of

function is asserted as the basis for a home entry, the circuit court must determine: (1) whether a search or seizure within the meaning of the Fourth Amendment has occurred; (2) if so, whether the police were exercising a bona fide community caretaker function; and (3) if so, whether the public interest outweighs the intrusion upon the privacy of the individual such that the community caretaker function was reasonably exercised within the context of a home.[10] *See id.* The State bears the burden of proof. *Id.*, ¶ 17.

### 2. Application of the three-step test

### i. Search requirement

¶ 30. The home "is accorded the full range of Fourth Amendment protections," *Lewis v. United*

the Wisconsin Constitution each time we have referred to the Fourth Amendment.

[10] The three-step test as laid out in *State v. Anderson,* 142 Wis. 2d 162, 169, 417 N.W.2d 411 (Ct. App. 1987), as applied in *State v. Kelsey C.R.,* 2001 WI 54, ¶ 35, 243 Wis. 2d 422, 626 N.W.2d 777, and as expressly adopted in *Kramer,* 315 Wis. 2d 414, ¶ 21 & n.8, was employed to determine whether a seizure conducted as a community caretaker function was reasonable. We have tailored the three-step test to apply to a warrantless search of a residence, the conduct at issue here, instead of a warrantless seizure of a person or property.

We recognize that searches and seizures "are constitutionally and analytically distinct" concepts. *State v. Arias,* 2008 WI 84, ¶ 25, 311 Wis. 2d 358, 752 N.W.2d 748. "A seizure differs from a search, as it deprives the individual of dominion over his or her person or property." *Id.* (internal quotations omitted). "A search invades different constitutionally protected interests—the privacy interests of a person." *Kramer,* 315 Wis. 2d 414, ¶ 40 n.10 (citing *Arias,* 311 Wis. 2d 358, ¶ 31). The community caretaker three-step test applies with equal force to both warrantless searches and warrantless seizures as both are interests protected under the Fourth Amendment.

*States,* 385 U.S. 206, 211 (1966), as "the physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed," *State v. Ferguson (Kelly Ferguson),* 2009 WI 50, ¶ 17, 317 Wis. 2d 586, 767 N.W.2d 187 (internal quotations omitted). "It is beyond question, therefore, that an unconsented police entry into a residential unit . . . constitutes a search . . . ." Wayne R. LaFave, *Search and Seizure* § 2.3(b) (4th ed. 2004). Accordingly, the officers' warrantless entry into Pinkard's home and their subsequent entry into his bedroom were searches within the meaning of the Fourth Amendment. *See State v. Boggess,* 115 Wis. 2d 443, 449, 340 N.W.2d 516 (1983) (concluding that officers' warrantless "entry into the Boggess residence was a search within the meaning of the fourth amendment").

ii. Bona fide community caretaker function

¶ 31.   The second step requires us to determine whether, under the circumstances as they existed at the time of the police conduct, an officer was engaged in a bona fide community caretaker function. *Kramer,* 315 Wis. 2d 414, ¶ 23. We recently rejected the argument that *Cady*'s statement that community caretaker functions be "totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute," *Cady,* 413 U.S. at 441, means "that if the police officer has any subjective law enforcement concerns, he cannot be engaging in a valid community caretaker function," *Kramer,* 315 Wis. 2d 414, ¶ 30.[11] Instead, we concluded that:

---

[11] The dissent notes that the evidence seized by the officers "can be used in court if the officers were engaged in 'a bona fide community caretaker function' that was 'totally divorced from

[A] court may consider an officer's subjective intent in evaluating whether the officer was acting as a bona fide community caretaker; however, if the court concludes that the officer has articulated an objectively reasonable basis under the totality of the circumstances for the community caretaker function, he has met the standard of acting as a bona fide community caretaker, whose community caretaker function is totally divorced from law enforcement functions.

*Id.*, ¶ 36.

¶ 32.  In the case before us, we conclude that the officers were engaged in a bona fide community caretaker function based on the following findings of the circuit court:    (1) police received a reliable anonymous tip that the occupants of Pinkard's home appeared to be sleeping near drugs, money and drug paraphernalia and that the rear door of the home was standing open; (2) the officers responded to Pinkard's house because they were concerned about the "health and safety" of the occupants; (3) the officers' corroboration that the rear door was indeed standing open; and (4) the officers repeatedly knocked and announced their presence be-

the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." Dissent, ¶ 65 (quoting *Kramer,* 315 Wis. 2d 414, ¶ 23). In isolation, this quote from *Kramer* is misleading because it fails to explain our interpretation of this language. *Kramer* clarified:

[T]he "totally divorced" language from *Cady* does not mean that if the police officer has any subjective law enforcement concerns, he cannot be engaging in a valid community caretaker function. Rather, we conclude that in a community caretaker context, when under the totality of the circumstances an objectively reasonable basis for the community caretaker function is shown, that determination is not negated by the officer's subjective law enforcement concerns.

*Kramer,* 315 Wis. 2d 414, ¶ 30.

fore entering the house and before entering the bedroom with no response of any type from Pinkard or his companion.

¶ 33.   Concededly, this is a close case. However, on these facts, we heed the *Horngren* court's caution against "taking a too-narrow view" in determining whether the community caretaker function is present. *Horngren,* 238 Wis. 2d 347, ¶ 18.

> "An officer less willing to discharge community caretaking functions implicates seriously undesirable consequences for society at large:   In that event, we might reasonably anticipate the assistance role of law enforcement . . . in this society will go downhill. . . . The police cannot obtain a warrant for . . . entry. [W]ithout a warrant, the police are powerless. In the future police will tell such concerned citizens, 'Sorry. We can't help you. We need a warrant and can't get one.' "

*Id.* (quoting *California v. Ray,* 981 P.2d 928, 939 (Cal. 1999) (further internal quotations omitted)); *see also Ziedonis,* 287 Wis. 2d 831, ¶ 15 (quoting with favor the same passage from *Ray*).

¶ 34.   First, we note that Osowski articulated two legitimate community caretaker functions underlying the warrantless entry into Pinkard's residence:   to ensure that the occupants were not the "victims of any type of crime" and "to safeguard any life or property in the residence." The circuit court implicitly found this testimony credible, finding that the officers arrived at Pinkard's residence "to inquire as to the health and safety of the individuals that were sleeping." These findings of fact are not clearly erroneous.[12] *See*

[12] The dissent does not acknowledge this finding of historical fact by the circuit court. It appears that the dissent rejects

*Steinbach v. Green Lake Sanitary Dist.,* 2006 WI 63, ¶ 10, 291 Wis. 2d 11, 715 N.W.2d 195.

██

¶ 35.   Based on the facts and circumstances here, an officer could reasonably be concerned that Pinkard and his companion may have overdosed on drugs. Both the anonymous caller and Lopez indicated that drugs and drug paraphernalia were present. The open doors to Pinkard's house and bedroom, along with Pinkard's unresponsiveness to law enforcement's repeated efforts to rouse him and his companion by knocking on the door also could indicate an overdose of drugs. Accordingly, the police officers had an objectively reasonable basis for deciding that entry into Pinkard's home was necessary to ensure the health and safety of the occupants.

¶ 36.   The anonymous call " 'exhibited sufficient indicia of reliability to justify' " concern for the health and safety of the occupants of Pinkard's residence and warranted further investigation. *See State v. Rutzinski,* 2001 WI 22, ¶ 23, 241 Wis. 2d 729, 623 N.W.2d 516 (quoting *Alabama v. White,* 496 U.S. 325, 332 (1990)). "[I]n cases where the police receive a tip from an unidentifiable informant, the tip nonetheless may be deemed reliable if it contains 'inside information' or a similar verifiable explanation of how the informant came to know of the information in the tip, which the police in turn independently corroborate." *Id.,* ¶ 25. Here, the anonymous caller explained how he "came to know of the information in the tip," *id.;* namely, that he had just been at Pinkard's house and witnessed what he

such finding, but fails to explain why it is clearly erroneous. *See State v. Fonte,* 2005 WI 77, ¶ 11, 281 Wis. 2d 654, 698 N.W.2d 594.

described to Lopez. Further, the officers independently corroborated the tip upon arriving outside Pinkard's residence and seeing the rear door was standing open, just as the caller described.

¶ 37. In addition to independently corroborating the anonymous caller's basis of knowledge, thereby demonstrating the reliability of the anonymous tip, the door to Pinkard's residence that was standing open is significant for at least two other reasons. First, the open door suggests that something untoward may have occurred inside the house and that the occupants may require assistance, i.e., that the occupants had been victims of a crime in which the assailant fled and left the door open or that they had ingested an overdose of drugs and were not able to close the door. Second, the open door reduces an individual's expectation of privacy. In *Bies,* we noted that had the garage door been closed, the officer "would not have been justified in opening it." *Bies,* 76 Wis. 2d at 472.

¶ 38. After seeing the rear door standing three-quarters open, the officers' knocked on the door and announced their presence. After waiting approximately 30–45 seconds and receiving no response, the officers' concern for the health and safety of the individuals was heightened. If the occupants were victims of a crime or had ingested an overdose of cocaine and therefore were unconscious, then the absence of any response to the officers' knock-and-announce, coupled with the open door, reasonably warranted the officers entering the residence to ensure the occupants' health and safety.

¶ 39. Once the officers entered the house, from their position just inside the doorway, the officers could see through the open bedroom door. Inside that bedroom, the officers saw exactly what the anonymous caller described, two occupants who appeared to be

sleeping. The officers loudly announced their presence again, and the occupants remained unresponsive. The continued unresponsiveness of the occupants failed to alleviate the officers' concern for the health and safety of the occupants.

¶ 40.  Although this could have been nothing more than a drug house, "given the multifaceted nature of police work," community caretaker and law enforcement functions "are not mutually exclusive." *Kramer*, 315 Wis. 2d 414, ¶ 39. Simply because Osowski could have had subjective law enforcement concerns, it does not necessarily follow that he also could not have been engaging in a bona fide community caretaker function as he entered Pinkard's residence. *See id.*, ¶ 30. To preclude an officer from exercising his community caretaker function anytime a situation involves an illegal drug, i.e., cocaine, would prevent officers from rescuing those who have ingested an excessive amount of drugs and are in need of medical assistance. Such a "result is neither sensible nor desirable." *Id.*, ¶ 34. Accordingly, we conclude that the officers were engaged in a bona fide community caretaker function when they entered Pinkard's residence.

### iii. Balance of interests

██

¶ 41.  The third step requires us to determine whether the officers' exercise of a bona fide community caretaker function was reasonable. *Id.*, ¶ 40. To make this determination, we balance the public interest or need that is furthered by the officers' conduct against the degree and nature of the intrusion on the citizen's constitutional interest. *Id.* "The stronger the public need and the more minimal the intrusion upon an

individual's liberty, the more likely the police conduct will be held to be reasonable." *Id.*, ¶ 41.

¶ 42.  In balancing these competing interests, we consider four factors:

"(1) the degree of the public interest and the exigency of the situation;[13] (2) the attendant circumstances surrounding the [search], including time, location, the degree of overt authority and force displayed; (3) whether an automobile is involved; and (4) the availability, feasibility and effectiveness of alternatives to the type of intrusion actually accomplished."

*Id.* (quoting *Kelsey C.R.*, 243 Wis. 2d 422, ¶ 36).

¶ 43.  We look to *Ziedonis* and *Shane Ferguson* for guidance on applying the first factor to an officer's warrantless entry into a residence. In *Shane Ferguson,* as we explained briefly above, officers responded to a 911 call about a fight and encountered an intoxicated juvenile who let them into the apartment. *Shane Ferguson*, 244 Wis. 2d 17, ¶¶ 2–3. Once inside, the officers saw several other intoxicated juveniles, one of whom was ill and vomiting. *Id.*, ¶ 4. The officers became concerned about a bedroom that was locked from the inside because they feared "that additional underage persons were in the bedroom, either ill or passed out." *Id.*, ¶ 5. After about 30 minutes of knocking-and-

---

[13] Assessing the "exigency of the situation" under the community caretaker exception to the warrant requirement is distinct from the exigent circumstances exception to the warrant requirement, which requires "both probable cause and exigent circumstances [to] overcome the individual's right to be free from government interference." *State v. Hughes,* 2000 WI 24, ¶ 17, 233 Wis. 2d 280, 607 N.W.2d 621.

announcing their presence and yelling with no response, the officers jimmied the lock and entered the bedroom. *Id.*

¶ 44. In *Ziedonis,* the officers responded to a complaint of animals running at large. *Ziedonis,* 287 Wis. 2d 831, ¶ 2. Upon arriving at the house, the officers encountered two vicious dogs that they tried unsuccessfully to corral. *Id.,* ¶ 3. A neighbor informed the officers that the dogs' owner lived in the back portion of the house and that he was home. *Id.,* ¶ 4. The officers made numerous unsuccessful attempts to contact the occupant, including sounding sirens and air horns and using a loud speaker to announce their presence. *Id.* Through a glass storm door, the officer thought he saw "something wrong with the person inside." *Id.,* ¶ 5. Out of "fear for the safety of the occupant" the officer opened the unlocked storm door and entered the residence. *Id.* (internal quotations and brackets omitted).

¶ 45. In both *Ziedonis* and *Shane Ferguson,* the court concluded that the officers reasonably exercised a bona fide community caretaker function in the context of a home. *Id.,* ¶ 34; *Shane Ferguson,* 244 Wis. 2d 17, ¶ 16. In comparing its case to *Shane Ferguson,* the *Ziedonis* court noted that in both cases there was a significant public interest in ensuring the safety of the occupants because the officers could not ascertain their physical condition and "reasonably concluded" that assistance was needed. *Ziedonis,* 287 Wis. 2d 831, ¶ 29.

¶ 46. The case before us is analogous to *Shane Ferguson* and *Ziedonis* in that the officers entered Pinkard's home out of concern for the safety of Pinkard and his companion. Further, as in *Shane Ferguson* and *Ziedonis,* the officers here did not know the physical

condition of Pinkard and his companion and reasonably concluded that the situation required intervention. *See id.*

¶ 47. If Pinkard and his companion had been suffering from a cocaine overdose, a reasonable inference based on these facts, the officers were presented with a significant exigency, for every passing minute could have been the difference between life and death. This exigency weighs in favor of concluding that the entry of the home was reasonable. As *Shane Ferguson* explained, the fear that an occupant was severely intoxicated was an exigent situation weighing in favor of the officers' entry into the locked room. *See Shane Ferguson,* 244 Wis. 2d 17, ¶ 16.

¶ 48. Since the public has a substantial interest in police ensuring the well-being and safety of citizens who may be suffering from a drug overdose or were the victims of a crime, and attached to both concerns are considerable exigencies, the first factor favors the conclusion that the officers' community caretaking function was reasonably exercised.

¶ 49. In considering the second reasonableness factor, we assess whether the " 'time, location, the degree of overt authority and force displayed' " were appropriate under the circumstances. *Kramer,* 315 Wis. 2d 414, ¶ 41 (quoting *Kelsey C.R.,* 243 Wis. 2d 422, ¶ 36). We first note that the officers did not control the time of day or location, but were responding to an anonymous tip. *See Horngren,* 238 Wis. 2d 347, ¶ 15. We recognize that in *Shane Ferguson* and *Ziedonis* the amount of time that passed prior to entry was significant. *See Shane Ferguson,* 244 Wis. 2d 17, ¶ 5 (waiting about 30 minutes prior to entering); *Ziedonis,* 287 Wis. 2d 831, ¶ 28 (waiting about 90 minutes prior to entering). However, in light of a more severe medical

concern at issue here, that is, a possible drug overdose, waiting 30 minutes was not feasible.

¶ 50. The court in *Horngren* recognized this. *Horngren,* 238 Wis. 2d 347, ¶ 15. In *Horngren,* the officers were responding to a suicide threat that the court noted had obvious exigency. *Id.* Almost immediately upon arriving, and without knocking and announcing their presence, the officers entered the front door of the apartment. *Id.,* ¶ 3. As soon as the door opened, a struggle ensued between the officers and Horngren. *Id.* The court concluded that the immediate no-knock entry was reasonable in light of the officers' belief that Horngren "was in danger of death or physical harm." *Id.,* ¶ 17.

¶ 51. The situation the officers faced here is similar to that in *Horngren* in regard to the effect time had on their actions. The officers believed that the occupants of Pinkard's residence were "in danger of death or physical harm"; therefore, it was not unreasonable for them to wait only 30–45 seconds prior to entering. *See id.* Further, the officers exercised more restraint than those in *Horngren* in that they loudly knocked and announced their presence before entering the house and again before entering the bedroom.

¶ 52. An additional factor here that was not present in *Horngren, Shane Ferguson* or *Ziedonis,* is the condition of the entry door to Pinkard's residence. It was standing three-quarters open, and the bedroom door was open as well. One could reasonably conclude that if Pinkard and his companion were able to provide privacy for themselves, they would have done so by closing the entry door. The open doors could be reasonably interpreted to indicate Pinkard's and his companion's inability to look after their own interests.

¶ 53. Pinkard argues that arriving at his residence with five Gang Unit officers demonstrates unreasonable force and overt authority. We do not agree. As we have explained, an officer is charged with both law enforcement and community caretaker functions. *Kramer,* 315 Wis. 2d 414, ¶ 32. "As an officer goes about his or her duties, an officer cannot always ascertain which hat the officer will wear—his law enforcement hat or her community caretaker hat. . . . Therefore, from the point of view of the officer, he or she must be prepared for either eventuality . . . ." *Id.*

¶ 54. Here, the circuit court found that the officers entered Pinkard's residence because they were concerned about the "health and safety" of the occupants. This demonstrates the officers' concern for the occupants. However, Osowski admitted that Pinkard's house sounded like a "drug house." Accordingly, sending five officers who belong to the Gang Unit, which performs narcotics investigations, was a reasonable precautionary measure to prepare for another eventuality.

¶ 55. We further note that there is no indication that any of the five officers employed any force or drew their weapons. The officers' search was limited to minimize the intrusion into Pinkard's home. Upon entry, the officers' went straight to the bedroom in which they saw the occupants from their position at the doorway; the officers did not enter any other rooms of the residence. Therefore, we conclude that the second factor weighs in favor of concluding that the officers' exercise of the community caretaker function was reasonable.

¶ 56. Under the third factor, we consider whether an automobile was involved in the exercise of the community caretaker function. *Id.,* ¶ 44. Such a con-

375

sideration is relevant because "[i]n some situations a citizen has a lesser expectation of privacy in an automobile" than in his or her home. *Anderson,* 142 Wis. 2d at 169 n.4. This is not a relevant factor here except to recognize that one has a heightened privacy interest in preventing intrusions into one's home.

¶ 57. Finally, we consider the feasibility and availability of alternatives to entering Pinkard's residence without a warrant. Pinkard argues that the officers could have telephoned the house or checked with the neighbors to determine whether an emergency situation existed. We agree that a number of alternatives were available, but none were feasible in light of the circumstances. *See Horngren,* 238 Wis. 2d 347, ¶ 15 ("While there were a number of less intrusive alternatives available, those less intrusive means, under the circumstances in this case, were simply not feasible.").

¶ 58. If Pinkard and his companion had indeed been victims of a crime or were suffering from a cocaine overdose, both reasonable inferences based on these facts, telephoning the house would have been a fruitless exercise because the individuals would not have been capable of answering the officers' phone call. Similarly, the officers could have checked with Pinkard's neighbors to determine whether they had seen anything suspicious; however, this was not a feasible option here in light of the exigency perceived by the officers.

¶ 59. Principles of reasonableness demand that we ask ourselves whether " 'the officers would have been derelict in their duty had they acted otherwise.' " *Deneui,* 775 N.W.2d at 239 (quoting *State v. Hetzko,* 283 So.2d 49, 52 (Fla. Ct. App. 1973)). Indeed, if the officers had done otherwise, perhaps by leaving the scene to obtain a warrant or waiting for an ambulance to arrive, we are convinced the citizens of the community would

have understandably viewed the officers' actions as poor police work. Further, " '[i]t must be emphasized that the fact that, as it turned out, no one was injured is of no moment.' " *Id.* (quoting *State v. Hedley*, 593 A.2d 576, 582 (Del. Super. Ct. 1990)). Therefore, we conclude that the fourth factor favors concluding that the officers reasonably exercised their community caretaker function.

¶ 60. Because three of the four factors weigh in favor of concluding that the officers reasonably performed their community caretaker function, the third step has been satisfied.

¶ 61. Accordingly, we conclude that the officers' warrantless entry into Pinkard's residence constituted a search, that the officers were engaged in a bona fide community caretaker function and that the community caretaker function was reasonably exercised under the totality of the circumstances.

## D. Plain View Exception

¶ 62. Pinkard concedes that the evidence seized in his bedroom was in plain view. Moreover, Pinkard does not dispute that if we conclude that the officers lawfully entered his home, the officers lawfully seized the items in plain view. *See State v. Johnston*, 184 Wis. 2d 794, 809, 518 N.W.2d 759 (1994) (citing *Coolidge v. New Hampshire*, 403 U.S. 443, 465 (1971)) (concluding that where an initial intrusion that brings the police within plain view of contraband is lawful under one of the recognized exceptions to the warrant requirement, the subsequent seizure of the contraband is legitimate). Accordingly, because we conclude that the officers' initial intrusion into Pinkard's home falls within the scope of the community caretaker exception to the

377

Fourth Amendment's warrant requirement, the seizure of the items within plain view was lawful.

## III. CONCLUSION

¶ 63. The dispositive issues in this case are whether the officers' warrantless entry into Pinkard's home came about during the exercise of a bona fide community caretaker function, and if so, whether that function was reasonably exercised, thereby permitting the subsequent seizure of evidence that was in plain view. We conclude that under the circumstances of this case, the officers' warrantless home entry to ensure the health and safety of the occupants was undertaken as a bona fide community caretaker function, which was reasonably exercised. Accordingly, the officers lawfully seized evidence of a crime that was in plain view. Therefore, we affirm the decision of the court of appeals.

*By the Court.*—The decision of the court of appeals is affirmed.

¶ 64. ANN WALSH BRADLEY, J. (*dissenting*). The question in this case is not whether officers could have entered Pinkard's residence without a warrant if they believed that medical assistance was needed. Of course they could have.

¶ 65. Rather, the question is whether the evidence they seized during this warrantless entry can be used in court to secure a criminal conviction. This evidence can be used in court if the officers were engaged in "a bona fide community caretaker function" that was "totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." *State v. Kramer,* 2009 WI 14, ¶ 23, 315 Wis. 2d 414, 750 N.W.2d 941.

¶ 66. The majority acknowledges that this case presents a close call. Nevertheless, it transforms a warrantless home search executed by five armed members of a drug unit acting on a tip about drugs into a community caretaker function. I fear that today's close call will become tomorrow's norm.

¶ 67. Given that the exceptions to the warrant requirement are to be carefully delineated, I cannot endorse the broad application of the community caretaking exception employed by the majority. Instead, I conclude that the five drug unit officers were not engaged in a bona fide community caretaker function that was totally divorced from an investigation of a criminal offense, and further that the officers' execution of the warrantless home search was unreasonable because of the substantial degree of invasion. Accordingly, I respectfully dissent.

I

¶ 68. The facts are briefly set forth below. Additional facts appear later in the discussion.

¶ 69. An individual who wished to remain anonymous called the police station and reported that the tenants of the rear apartment at 2439 South 7th Street were sleeping, the back door of the apartment was open, and the tipster observed cocaine, money, and a scale. The informant advised that he had just been at the apartment. After receiving this tip, Officer Lopez called Officer Osowski, a member of the drug unit, on his personal cell phone. Officer Osowski arrived at the residence with four other armed members of the drug unit. They found that the rear door to the apartment was about three-quarters open.

¶ 70. From their vantage point at the door, the officers could not see into the bedroom, and there was

379

no incriminating evidence in plain view. The officers knocked on the door, announced their presence, and waited for 30 to 45 seconds. After hearing no response, they entered the apartment. They first went into the living room. To the left of the living room was a bedroom. They entered through the doorway of the bedroom and found Pinkard and his girlfriend sleeping in bed. They also found cocaine, marijuana, and currency. Officers roused Pinkard and arrested him. Officer Osowski then searched the bedroom area, lifted the mattress, and seized a revolver that was underneath it.

¶ 71. Upon reviewing the facts, the majority concludes that "officers responded to Pinkard's house because they were concerned about the 'health and safety' of the occupants." Majority op., ¶ 32. It brushes aside Officer Osowski's testimony that he was responding to a tip about a house that "sounded like a drug house to me." It explains: "Simply because Osowski could have had subjective law enforcement concerns, it does not necessarily follow that he could not have also been engaging in a bona fide community caretaker function as he entered Pinkard's residence." *Id.*, ¶ 40. Although the testimony does not reveal that the officers were concerned about the possibility of an overdose, the majority hypothetically concludes that "an officer could reasonably be concerned that Pinkard and his companion may have overdosed on drugs." *Id.*, ¶ 35.

¶ 72. The majority advances a second hypothetical when it cautions that "a too-narrow view" of the community caretaker function is undesirable. *Id.*, ¶ 33. It explains that if the exception is interpreted narrowly, officers will be "less willing to discharge community caretaking functions" and will instead inform distressed

citizens: "Sorry. We can't help you." *Id.*, ¶ 33 (quoting *State v. Horngren,* 2000 WI App 177, ¶ 18, 238 Wis. 2d 347, 617 N.W.2d 508).

¶ 73. Undoubtedly, officers who are genuinely concerned about the safety and wellbeing of occupants of a home can and should enter to provide needed assistance—even when they have no warrant. If the officers' concerns are realized and they succeed in preventing harm, they have performed an invaluable service. Yet, the majority presumes that officers will refuse to act in a caretaking role if the evidence that they uncover while caretaking cannot be used to secure a criminal conviction. *See* majority op., ¶ 33.

¶ 74. I do not agree with the majority's presumption. Every day, law enforcement officers across this state perform vital community caretaker functions. I believe these dedicated officers will continue to act as caretakers when their assistance is needed—even if they happen upon evidence that later cannot be used to secure a conviction.

¶ 75. I likewise cannot agree with the majority's broad application of the community caretaking exception. A broad application raises the specter that the exception will be misused as a pretext to engage in unconstitutional searches that are executed with the purpose of acquiring evidence of a crime. If courts are not cautious in applying this exception, the presumptive unreasonableness of warrantless home searches will be undermined.

II

¶ 76. When I examine the facts of this warrantless home search, I conclude that the community caretaking exception does not apply. The five members of the drug

unit were not engaged in a bona fide community caretaker function that was totally divorced from their law enforcement function, but rather were conducting a warrantless home search pursuant to a criminal investigation. Further, even if the officers had been engaged in a bona fide community caretaker function, their execution of this function was not reasonable because of the substantial degree of intrusion. I address these conclusions in turn.

A

¶ 77. Our cases have held that "in order for police conduct to be upheld" under the community caretaker exception, "the officer must be engaged in a bona fide community caretaker function." *Kramer,* 315 Wis. 2d 414, ¶ 23. "Bona fide" means authentic, genuine, true, or sincere. A community caretaker function is "totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." *Id.*[1]

¶ 78. The requirement that the exercise of the community caretaker function be bona fide means that the officers must be able to articulate an objectively

---

[1] In *Kramer,* this court explained how an officer meets the standard "of acting as a bona fide community caretaker, whose community caretaker function is totally divorced from law enforcement functions." *State v. Kramer,* 2009 WI 14, ¶ 36, 315 Wis. 2d 414, 759 N.W.2d 598. It explained: "[A] court may consider an officer's subjective intent in evaluating whether the officer was acting as a bona fide community caretaker; however, if the court concludes that the officer has articulated an objectively reasonable basis under the totality of the circumstances for the community caretaker function, he has met the standard of acting as a bona fide community caretaker, whose community caretaker function is totally divorced from law enforcement functions." *Id.*

reasonable belief that entry into the home is necessary to prevent harm. An officer's subjective motivations may be considered within the totality of circumstances. *Id.*, ¶ 27.

¶ 79. As we indicated in *Kramer*, an officer's subjective conclusions are not dispositive of the inquiry. However, the pretextual, subjective motivations of an officer are factors that "warrant consideration" when police conduct takes place in the absence of probable cause. *Kramer*, ¶ 27 (citing Wayne R. LaFave et al., *Criminal Procedure* § 3.1(d) (3d ed. 2007)).

¶ 80. The circumstances in *Kramer* provide a useful illustration as to the kinds of situations in which the community caretaker exception should apply. In that case, a patrolling officer stopped to check on a truck that was pulled to the side of the road after dark with its hazard lights turned on. *Id.*, ¶ 4. The officer explained that he stopped to "check to see if there actually was a driver, and to offer any assistance." *Id.*, ¶ 5. He explained, "when a car is on the shoulder on the side of the road with its hazards on, there are typically vehicle problems." *Id.* As it turned out, Kramer had pulled over and turned on his hazards to make a call on his cell phone—and he was intoxicated.

¶ 81. On cross-examination, the officer was asked why, if he was acting in his community caretaker function, he shined his flashlight through the window of the truck and put his hand on his holstered gun as he approached. The officer explained, "I always do that for safety considerations. I don't know who is in the vehicle or what the situation dictates. I am just at the ready." *Id.*, ¶ 6. When asked if he thought that a crime might be taking place, the officer responded: "It was in my mind. I'm not sure any time I come upon a vehicle what the situation is, so, yes." *Id.*

¶ 82. It is one thing to recognize, as we did in *Kramer*, that officers who are performing bona fide community caretaker functions are wise to avoid "let[ting] down their guard and unnecessarily expos[ing] themselves to dangerous conditions" when approaching an unknown situation. *Id.*, ¶ 33. It is quite another thing to label a warrantless search by five officers of the drug unit a bona fide community caretaker function solely because one officer testified that he entered what "sounded like a drug house" to "check the welfare of the occupants."[2]

¶ 83. Here, in contrast with the situation in *Kramer*, the officers' actions do not evince that the warrantless home search was conducted as a bona fide exercise of the community caretaker function out of a concern for the safety of the occupants of the house. Instead, the officers' actions indicate that they consid-

---

[2] The majority takes this dissent to task for failing to acknowledge the circuit court's findings of historical fact. Majority op., ¶ 34, n.12. It asserts that the circuit court found "that the officers arrived at Pinkard's residence to inquire as to the health and safety of the individuals that were sleeping." *Id.*, ¶ 34. Although the transcript does reflect that the circuit court made specific findings of fact, this is not one of them.

Rather, the court made this comment when explaining its reasons for suppressing the gun that officers found under Pinkard's mattress. It appeared to conclude that the officers' search for the gun was incompatible with their stated reasons for entering Pinkard's home: "Mr. Pinkard was then under arrest, in custody, in cuffs, and therefore, the search of [Pinkard's] lunge area, as a search incident to arrest, I find is inappropriate under the community caretaker function. . . . I understand that there were many gray areas within this, but the purpose that the police were there was, in essence, to inquire as to the health and safety of the individuals that were sleeping. And so the Court is suppressing the gun[.]"

ered the anonymous tip provided to be a "complaint" about criminal activity and their subsequent home entry an "investigation" rather than a rescue.

¶ 84.   The majority seizes upon a snippet in Officer Osowski's testimony during the suppression hearing to conclude that "the officers responded to Pinkard's home because they were concerned about the health and safety of the occupants." Officer Osowski testified that over the phone, Officer Lopez stated he was "concerned" about the occupants. However, there is nothing in the record indicating that Officer Lopez articulated anything about how or why he was concerned.

¶ 85.   Officer Osowski's mention of this purported concern was brief and ambiguous:

Prosecutor: What was the nature of that investigation?

Osowski: I had received a phone call from Officer Lopez from District 6 that stated an anonymous caller had called him and stated that there were two individuals who appeared to be sleeping at that residence, and there was cocaine, money, and scales present there.

Prosecutor: Did Officer Lopez tell you anything else about the condition of the residence . . . or people there?

Osowski: He did.

Prosecutor: What else did he tell you?

Osowski: He said the door was wide open, and he was concerned about them.

¶ 86.   Officer Osowski and Officer Lopez each wrote an investigation report shortly after the incident. It is telling that Officer Lopez's purported "concern" for the occupants was not mentioned by either officer in his

investigation report.[3] Rather, both investigation reports state that Officer Osowski went to the home to "investigate this complaint."

¶ 87.  After Officer Lopez received the tip, he did not call for an ambulance or paramedics. Further, he did not send a transmission over the police scanner asking any officer in the area to drop by the apartment to make sure everything was okay. Rather, he called Officer Osowski, a member of the drug unit, on his personal cell phone and asked him to "investigate this complaint."

¶ 88.  Although Officer Osowski stated that he "made the determination to enter and check the welfare of the occupants," he acknowledged that there was no indication that the occupants of the house needed medical attention. Further, he had no knowledge that the occupants of the house were in danger:

> Defense: [Officer Lopez] didn't tell you at least, or at least you had no knowledge, that these people were in some medical — needed some medical attention; did they?
>
> Osowski: Not at that time.

---

[3] In full, Officer Lopez's report provides:

On Thursday, August 24, 2006, at approximately 8:55 a.m., I sqd 246A received a phone call at District Six from a citizen who wished to remain anonymous. The citizen reported to me that it was just at the location of 2439 South 7th Street, in the rear apartment. The citizen stated that the tenants of the residence, "Big Boy" and his girlfriend "Amalia" appeared to be sleeping and the back door to the residence was open. The citizen further stated that it observed cocaine, money and a scale next to the subjects. I was unable to investigate this complaint because of a prior engagement, I subsequently notified Officer John OSOWSKI of the Criminal Intelligence Division, Gang Squad. Officer OSOWSKI stated that he would investigate the complaint.

Defense: He didn't say that they were in fear of some-thing happening inside the residence that in fact would jeopardize the safety of those people inside?

Osowski: No, he didn't relay that to me on the phone, just the information that I told you.

Defense: He actually indicated to you that it was basically a drug investigation. These people are sound asleep, and there's drugs and scales and guns in there; right?

Osowski: He did not say that, no.

Defense: Well, your report indicates that in fact that's why you went there is because there appeared to be cocaine, money and scales there?

Osowski: That's correct. It appeared to be — sounded like a drug house to me.

Defense: Officer Lopez did not indicate to you that there was some emergency with regard to the people at the residence themselves that needed some type of medical attention or were in some need of the Police Department rescuing them; did he?

Osowski: No.

¶ 89. After receiving the phone call, Officer Osowski went to "investigate the complaint" of a house that, he testified, "sounded like a drug house to me." He took four additional members of the drug unit with him. After arriving at the residence, noticing the open door, and knocking and waiting for 30 to 45 seconds, Officer Osowski and the other officers decided to enter the residence.

¶ 90. Perhaps the majority tacitly acknowledges that the facts, as articulated by the officers, do not add up to a bona fide exercise of community caretaking. The

majority assembles a hypothetical rationale to justify application of the exception. It concludes that "an officer could reasonably be concerned that Pinkard and his companion may have overdosed on drugs." Majority op., ¶ 35.

¶ 91.  This rationale is troubling for two reasons. First, the officers never articulated any concern about the possibility of an overdose. As mentioned above, courts should consider an officer's subjective intent in evaluating whether the officer has articulated an objectively reasonable basis under the totality of the circumstances for the community caretaker function. *Kramer,* 315 Wis. 2d 414, ¶ 36.

¶ 92.  Second, an unarticulated concern about the possibility of an overdose can always be later invoked by a court when officers arrive at what they think is a "drug house" and the inhabitants fail to respond to the officers' knock. If that unarticulated concern now permits officers to enter the home without a warrant and without probable cause, then it is unclear what constraints remain on warrantless home searches when there is a suspicion of drug activity.

¶ 93.  The United States Supreme Court has cautioned against blanket rules applied to categories of offenders. "Those suspected of drug offenses are no less entitled to that protection [provided by the Fourth Amendment] than those suspected of nondrug offenses." *United States v. Karo,* 468 U.S. 705, 717 (1984). The majority's assertions should not be read as permitting warrantless entry of a home whenever there is a suspicion of drug use and the residents do not answer.

¶ 94.  Under the totality of circumstances, I conclude that the five drug unit officers were not exercising a "bona fide community caretaker function" when they entered Pinkard's home without a warrant. Rather, it

appears that they entered for the law enforcement purpose of "detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." *Kramer,* 315 Wis. 2d 414, ¶ 11 (quoting *Cady v. Dombrowski,* 413 U.S. 433, 441 (1973)).

B

¶ 95.  Even if the officers' community caretaking had been bona fide, the exercise of the caretaker function was not reasonable. In evaluating the reasonableness, courts must determine whether "a public interest or need that is furthered by the officer's conduct" outweighs "the degree of and nature of the restriction upon the liberty interest of the citizen." *Kramer,* 315 Wis. 2d 414, ¶ 40. Despite the majority's conclusion, the balancing test is not satisfied here.

¶ 96.  The facts reveal that the officers' entry was invasive, consistent with a drug bust rather than a rescue. Five armed officers, all members of the drug unit, waited outside for less than a minute before making a warrantless entry into Pinkard's home. Nothing in the record suggests that the officers paused to consider less invasive alternatives.[4] Little in the record would support a public interest or need.

---

[4] It is helpful to compare the facts of this case to the facts in *State v. Ziedonis,* which also involved a warrantless search of a home. 2005 WI App 249, 287 Wis. 2d 831, 707 N.W.2d 565. There, the police spent an hour and a half trying to corral six vicious dogs before they entered the defendants' home. *Id.,* ¶ 6. The court of appeals concluded that the officers "did everything they could to avoid entering the house"—they made numerous attempts to contact the occupant of the house, including using sirens, air horns, and a loud speaker. Immediately prior to entering, they yelled loudly and banged on the door frame with a metal baton for over two minutes. *Id.,* ¶ 27.

¶ 97. An important consideration in the balance is that this case is unlike the majority of cases addressing the community caretaking exception: this search involves the warrantless entry of a home. In my estimation, the fact that this search involved a home weighs heavily against concluding that the officers' highly invasive search was reasonable.

¶ 98. It is noteworthy that the United States Supreme Court has never extended the community caretaker exception to justify a warrantless entry of a home. Rather, all three cases addressing the exception are in the context of inventory searches of vehicles. *See Colorado v. Bertine*, 479 U.S. 367 (1987); *South Dakota v. Opperman*, 428 U.S. 364 (1976); *Cady v. Dombrowski*, 413 U.S. 433 (1973). Further, like the Supreme Court, this court has never extended the exception to justify warrantless entry of a home.[5] Never, until now.

---

[5] The majority asserts that *State v. Bies*, 76 Wis. 2d 457, 251 N.W.2d 461 (1977), "necessarily implies" that the community caretaker function may support a warrantless home entry. Majority op., ¶ 22. It assumes that because the community caretaker function may permit entry onto the curtilage, it would also permit entry into a home. This assumption is directly undermined by the language of *Bies*.

In *Bies*, an officer walked behind the defendant's garage to investigate a noise complaint. *Bies*, 76 Wis. 2d at 461. The court held that the community caretaker function justified the officer's presence behind the garage on the defendant's curtilage. *Id.* at 471. Once he was lawfully behind the garage, the officer looked through an empty doorframe and saw a stolen cable. *Id.* at 472. The language in *Bies* makes clear that although the community caretaker function justified the officer's presence behind the garage, it would not have permitted the officer to enter the open garage door: "The officer could see [the stolen wire] from his position outside the empty doorframe . . . . The cable was in plain view." *Id.* at 473. In *Bies,*

¶ 99.   A reasonable warrantless search of a vehicle may be unreasonable in the context of a search of a home. *See Cardwell v. Lewis,* 417 U.S. 583, 590–91 (1974). It is particularly troubling that the majority uses a case it deems a "close call" to break new ground and circumscribe constitutional rights. The majority should heed the United States Supreme Court's warning from over a century ago: "illegitimate and unconstitutional practices get their first footing . . . by silent approaches and slight deviations from legal modes of procedure." *Boyd v. United States,* 116 U.S. 616, 635 (1886).

¶ 100.   For the reasons set forth above, I respectfully dissent.

¶ 101.   I am authorized to state that Chief Justice SHIRLEY S. ABRAHAMSON and Justice DAVID T. PROSSER join this dissent.

---

it was the plain view doctrine, not the community caretaker exception, that supported warrantless home entry.